

Dated: January 9th, 2024

**<u>YOU ARE IN POSSESSION OF A DOCUMENT FILED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE THAT IS CONFIDENTIAL AND FILED UNDER SEAL. If you are not authorized by Court order to view or retrieve this document read no further than this page and you should contact the following person:</u>**

**COURT CLERK FOR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**



Plaintiffs,

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

V.

| | |
|---|---|
| **Petróleos de Venezuela, S.A.** **(PDVSA)**; Defendant **PDV Holding, Inc.;** Defendant **PDV America, Inc.,** Defendant **CITGO Holding, Inc.;** Defendant | **COMPLAINT FOR VIOLATION OF LABOR RIGHTS, HUMAN RIGHTS, FREEDOM OF SPEECH RIGHTS, BREACH OF CONTRACT AND OTHER VIOLATION OF HUMAN RIGHTS CAUSES.** **Demand For Jury Trial** |

| | |
|---|---|
| **CITGO Petroleum** **Corporation;** Defendant **Junta Administradora Ad-Hoc** **de PDVSA;** Defendant <br><br>Defendants, | **Case No:** **1:23-cv-00989-MN\*SEALED\*** |

## <u>TABLE OF CONTENTS</u>

| | |
|---|---|
| Certificate of Compliance With Type-Volume Limit | 1 |
| File for **COMPLAINT FOR VIOLATION OF LABOR RIGHTS, HUMAN RIGHTS, BREACH OF CONTRACT AND OTHER CAUSES.** | 2 |
| TABLE OF CONTENTS | 6 |
| TABLE OF AUTHORITIES | 8 |
| INTRODUCTORY STATEMENT | 10 |
| **CLASS ACTION CONSIDERATIONS** | 17 |
| **CLAIMS FOR RELIEF** | 35 |
| STATEMENT OF THE IDENTITY OF THE PLAINTIFFS, OUR  INTEREST IN THE CASE, AND THE SOURCE OF OUR AUTHORITY TO FILE | 38 |
| APPLICABLE LAW, JURISDICTION AND VENUE<br>Applicable Law<br>Jurisdiction and Venue. | 41<br>41<br>43 |
| THE PARTIES | 45 |
| Plaintiffs | 45 |
| Defendants | 45 |
| Co Conspirators | 49 |
| SUMMARY OF ARGUMENT AND ARGUMENT | 52 |

| | |
|---|---|
| TOLLING AND SUSPENSION OF THE STATUTES OF LIMITATION | 79 |
| LEGAL ALLEGATIONS AND CAUSE OF ACTION | 82 |
| FIRST CAUSE OF ACTION - Contractual | 84 |
| SECOND CAUSE OF ACTION-Tort-related causes of action | 86 |
| THIRD CAUSE OF ACTION - Precedent causes of action | 92 |
| FOURTH CAUSE OF ACTION (Equity-related causes of action) | 93 |
| FRAUDULENT CONCEALMENT | 94 |
| DAMAGES | 96 |
| JURY TRIAL DEMAND | 98 |
| PRAYER FOR RELIEF | 98 |
| PROPOSED ORDER | 101 |
| List, identification and standing of Plaintiffs. List of other entities and acronym | Attachment I |
| Statements and evidence on terrorist activities of the Venezuelan Government including persecution of union leaders, civic leaders, etc. | Attachment II |

## TABLE OF AUTHORITIES

**Federal Cases**

1. Cuba R. Co. v. Crosby, 222 U.S. 473 (1912)

2. Slater v. Mexican National R. Co., 194 U. S. 120, 194 U. S. 126.

3. American Banana Co. v. United Fruit Co., 213 U. S. 347, 213 U. S. 356.

4. Bean v. Morris, 221 U. S. 485, 221 U. S. 486-487.

5. Comm. of Blind Vendors v. District of Columbia, Civ. A. No. 88-0412-OG on the "continuing wrong doctrine"

6. Syms v. Olin Corp., 408 F.3d 95, 108 (2d Cir. 2005). on the "continuing tort doctrine,"

7. National RR Passenger Corp. v. Moigan, 536 U.S. 101, 110, 114 (2002) on "continuing violation doctrine" and "continuing violations doctrine".

8. 114 F. Supp. 2d 117, 134-35 (E.D.N.Y 2000)

**Rules**

1. Federal Rule of Civil Procedure 4(k); Federal Rule of Civil Procedure 44.1

2. 28 U.S.C. § 1332

3. 28 U.S.C. § 1391(b) ; 28 U.S.C. § 1391(b)(2) ; 28 U.S.C. § 1391(f)(3)..

4. Del. C. § 321(a), 10

5. Del. C. § 3111

**Foreign Laws**

1. Constitution of the Bolivarian Republic of Venezuela - Constitución de la República Bolivariana de Venezuela

2. Organic Labor Law of the Bolivarian Republic of Venezuela - Ley Orgánica del Trabajo de la República Bolivariana de Venezuela

3. Law against discrimination of the Bolivarian Republic of Venezuela - Ley contra la discriminacion de la Republica Bolivariana de Venezuela.

01. *in limine litis* Plaintiffs pray the court to file the case with pseudonyms for the Plaintiffs in order to protect the identity of claimants for the safety concerns explained in the claim. 

02. Plaintiff ███████████████████████████████ waives the identity protection request.

## 05. INTRODUCTORY STATEMENT

06. A second amended complaint is brought to this honorable court of law in the above caption matter.

07. The need for an amended complaint from plaintiffs arises from the following.

08. Plaintiffs are to underline that the claim is mainly a claim on the violation of human rights of plaintiffs and a large number of American and Venezuelan families in the same or similar situation of Plaintiffs whose rights have been violated by Defendants, as early as 2003 and as late as that the violations are ongoing. The affected individuals, in the case of those in similar

circumstances to Plaintiffs and to whom the Court might decide to indemnify is of over twenty thousand persons.

09. According to statements of Defendants, the number of oil workers affected by the abusive actions of Defendants is of over twenty thousand persons.

10. According to statements of Defendants, the number of persons of the families affected by the actions of Defendants is of over one hundred thousand persons (direct dependants of the affected persons).

11. The actions of Defendants not only affected its employees but also a number of contractors, not only specialty contractors but also firms and workers in the media, as Defendants engaged for several years in policies in order to ban the work ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

12. Where Plaintiffs state the loss of wages, loss of contracts, seize or destruction of property and similar wrongs from Defendants, it is to be underlined that such wrongs were some of the means by which political persecution and freedom of speech was attacked for several years by Defendants and against Plaintiffs.

13. Plaintiffs are to underline that Defendants acted in concert as conspirators in order to violate the human rights of claimants.

14. In several cases, Defendants were responsible or co-responsible for the loss of life and other atrocious damages to non direct plaintiffs in the same condition of Plaintiffs.

15. Plaintiffs have been victims of terrorist actions by Defendants, within the meaning and scope of the law.

16. This case is brought to  this honorable court in an extremely difficult and complicated situation for Plaintiffs and all affected and therefore pray for the understanding of the court due to the special circumstances of the case. The particular circumstances are the risk for life, unlawful prison, property seizure, injuries and other material threats that relate to the presentation of the case by Plaintiffs against some of the Defendants.   Exceptions and special considerations prayed to the court include ██████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

17. Identification, standing of Plaintiffs as well as some specific details of the injuries suffered is provided ███████████ the causes of action do not single them in such a specific way in order to avoid the possibility of Plaintiffs being singled and identified by any specific characteristic of their cases.

20. **Plaintiffs and all those individuals in the same or similar condition as Plaintiffs are at risk of making illusory any expectation for injunctive relief or other relief as per the recent statements expressed by President of Defendant Junta Administradora de PDVSA regarding risk of complete insolvency of Defendants[1]. This would be the case even if considered as preferential creditors under the Laws protecting rights of workers or victims of terrorist actions under Terrorism Risk Insurance Act (TRIA) (H.R. 3210) .**

21. Defendants engaged in a pattern of corruption, mismanagement, money laundering and fraud that has caused significant harm to workers of PDVSA, to its contractors, freelancers, media workers, other workers, human rights activists.

22. Defendants engaged in a pattern of terrorist actions, corruption, mismanagement, and fraud that has caused significant harm to freedom of speech. The financing of terrorist groups, militia and similars that have taken action against Plaintiffs, either workers, former workers, journalists, media

---

[1] Reuters: Claims pursuing Citgo's assets surpass $20 billion, supervisory board says

Reuters.
https://www.reuters.com/business/energy/claims-pursuing-citgos-assets-surpass-20-bln-supervisory-board-2023-05-31/

workers, media directors, media owners, has been an ongoing activity carried out by Defendants for all times material.

23. The prosecution of separate actions by each of Plaintiffs could potentially establish inconsistent standards of conduct for the Defendants.

24. Final injunctive or declaratory relief is appropriate with respect to the Plaintiffs as a whole because the Defendants acted on grounds generally applicable to Plaintiffs as a whole.

25. Common questions of law or fact predominate over issues of each of the individual Plaintiffs, and this action is a proper mechanism for fairly and efficiently resolving the controversy.

26. As Plaintiffs pray the court for applicable law - substantive - that of Venezuela, it is to be underlined that the Constitution of the Bolivarian Republic of Venezuela (CRBV) expressly prohibits discrimination on any grounds, including political grounds. Article 21 of the CRBV states that "all persons are equal before the law, without distinction of race, color, sex, creed, age, marital status, social origin, economic condition, social condition, language, religion, political or philosophical opinion, union affiliation, or any other personal or social condition." Article 22 of the CRBV states that "the State shall guarantee equal rights and opportunities for women and men in all spheres of life. It shall promote the eradication of

all forms of discrimination against women, on grounds of gender, race, ethnicity, sexual orientation, gender identity, age, social condition, economic condition, language, religion, political or philosophical opinion, union affiliation, or any other personal or social condition." The Organic Law of Labor, Workers, and Working Women (LOTTT) also prohibits discrimination on political grounds. Article 25 of the LOTTT states that "workers have the right to participate in political and union life, without discrimination on grounds of political or union affiliation." Article 14 of the Organic Law Against Discrimination establishes that "discrimination is any distinction, exclusion, or restriction based on race, color, sex, ethnicity, national or social origin, age, disability, health condition, economic condition, social condition, language, creed, political or philosophical opinion, union affiliation, or any other personal or social condition, that has the purpose or effect of nullifying or impairing the recognition, enjoyment, or exercise in equal conditions of human rights and fundamental freedoms in the political, economic, social, cultural, or any other sphere of public or private life."   Article 15 of the Organic Law Against Discrimination establishes that "all forms of discrimination are prohibited, especially those that refer to:  Access to employment, education, health care, housing, social security, culture, sports, recreation, leisure time, decent work, political

participation, public services, public goods and services, justice, legal security, protection of mental health, and participation in public spaces." The Organic Law Against Discrimination also establishes sanctions for persons who commit acts of discrimination. Article 23 of the law establishes that "persons who commit acts of discrimination shall be punished with a fine of one thousand to five thousand tax units, without prejudice to the civil reparation that may correspond." In conclusion, Venezuelan laws expressly prohibit discrimination on political grounds. Persons and organizations who are discriminated against on the basis of their political opinion are entitled to file a complaint with the competent authorities.

27. This action is for damages upon the Plaintiffs, ███████████████



from 1987 to  2023. The Plaintiffs who were employed or contracted by Defendants and that after being wrongfully fired or their contracts canceled, or were banned by CITGO

officials to seek employment in CITGO Corporation or its affiliates. The Plaintiffs allege and will prove beyond doubt that PDVSA violated their employment contracts by failing to pay them their full wages and benefits and by abusing the management of the workers pension fund, by breach of contract in housing and other benefits, as well as a number of additional damages explained in this writing. And by benefiting with an unjust enrichment derived from unduly retaining workers fees, wages, contractor equipments, unpaid and unprocessed invoices and a number of other abusive conducts for substantial amounts;

28. Upon discretion of the Court or by acceptance of Defendants, damages can be agreed on more than twenty-thousand oil workers and their families, totalling approximately one-hundred-twenty-thousand persons to be indemnified due to the wrongs of Defendants and



29. This action is as well for damages upon the Plaintiffs, who are either

that caused significant harm to freedom of speech in Venezuela as well as the financing by Defendants of terrorist groups, militia and similars which took actions

that wronged ███████████████████████████████████████████

███████████████

30. Plaintiffs allege and will prove beyond doubt that Defendants violated universally recognized freedom of speech rights, by breach of contract in contracting with media, as well as a number of additional damages explained in this writing and a number of other abusive conducts for substantial amounts; as well as for the Plaintiffs to whom the right to work was denied by the Defendants and CoConspirators in grounds of political retaliation; as well as for the properties that were seized, were physically or psychologically wronged by the Defendants and CoConspirators in grounds of political retaliation.

31. It is to be noted that right to work was impeded by the Defendants and CoConspirators in grounds of political retaliation, both in the case of ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████. Defendants have unlawfully imprisoned, prosecuted and caused enormous injuries to Plaintiffs. Defendants have illegally seized family property of Plaintiffs. Plaintiffs allege as well that Defendants Petróleos de Venezuela, S.A. (PDVSA); PDV Holding; PDV America, CITGO; were

active perpetrator of these actions and collaborated among them (the Defendants) and also colaborated with co-conspirator GOVERNMENT OF BOLIVARIAN REPUBLIC OF VENEZUELA in the actions performed against Plaintiffs and others in the same situation.

32. ██████████████████████████████████████████████████████

██████████ **the Plaintiffs pray the court to consider granting the Plaintiffs the leave to file in representation of those under their same or similar circumstances, should this honorable court of law so consider in the best interest of fairness and justice.**

33. Each of Plaintiffs has standing as described in the main document and in Attachment I.

34. Plaintiffs have strong reason to consider that once the Discovery process has been performed, a number of additional Defendants will arise.

35. **Plaintiffs understand that the case is of a complex nature and at the moment actively seek for Counsel in the State of Delaware**.

36. Plaintiffs respectfully file this **COMPLAINT FOR VIOLATION OF HUMAN RIGHTS, FREEDOM OF SPEECH, LABOR RIGHTS, BREACH OF CONTRACT AND OTHER CAUSES.**

37. A proposed order is attached to this Second Amended Complaint.

38. The wrongs against Plaintiffs and others in similar situations was performed with the participation of other entities that acted as co-conspirators that joined or served PDVSA and CITGO in their wrongful purposes against Venezuelan workers.





## **CLASS ACTIONS CONSIDERATIONS FOR AN EVENTUAL**

## **CONSIDERATION OF THE COURT**

45. Plaintiffs pray the court to consider class action certification, appointment of Plaintiffs as Class Representatives, appointment of Class Counsel on the discretion of the court, and other measures the court might deem as proper.

46. Plaintiffs bring to the attention of the court that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ former workers for Defendants, have registered as interested parties for their wrongful termination on political

grounds, political persecution, unlawful appropriation by PDVSA of their retirement fund assets, pending wages, etc. This comprises part of the more than Twenty-thousand directly affected oil workers persecuted by Defendants.

47. Additionally, 

Plaintiffs have previously provided a list of affected individuals additional to Plaintiffs as well as short testimonials from each of them to the Court and consider it hereby incorporated..

48. We have reason to assess that a class action settlement for each of the Potential Plaintiffs (Putative Class Members) would allow a complete settlement of the case and avoid costly litigation and further damages.

49. Court might consider, in the best interest of justice, to grant relief to a special group of collectively wronged persons, namely the children of the cancer hospital ███████████, whereas CITGO and PDVSA failed to comply with the contractual duties of paying the hospital invoices for such group of children. As the families of said children are in dire poverty and

unable to claim by themselves, the Plaintiffs bring this issue to the attention of the court, moreover as Lead Plaintiff ██████████████████████ expressly notified CITGO and PDVSA of their duties with respect to these children since 2019, and due to political considerations CITGO and PDVSA did not honor the duties of payment, which indeed relates to the early death and suffering of these children. This unusual request relates directly to the unusual circumstances of the case.

50. **The Plaintiffs pray, if the court considers to certify a class action and so considers, to be appointed Class Representatives. Plaintiffs are aware of the usual denial of Class Certification or Counsel for Pro Se litigants therefore it is brought to light for an eventual special consideration in this case for the alleged reasons and perhaps in the best interest of justice.  While most of the affected are persons currently domiciled in Venezuela, several dozens of these wronged persons are US residents, in the states of Texas, Florida, New York and other States of the Union as well as other countries.**

51. **The court might consider the following reasoning with regards to an eventual class action certification or similar, which is,**

   *CLASS ACTION JUSTIFICATION*

The fundamental aims of class actions are (1) "to promote judicial economy and efficiency by obviating the need for multiple adjudications of the same issues[,]" 5 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 23.02 (3d ed.1998) (citing General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) and American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)), (2) "to afford aggrieved persons a remedy if it is not economically feasible to obtain relief through ... multiple individual damage actions[,]" id. (citing Deposit Guar. Nat. Bank v. Roper, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, ----, 117 S.Ct. 2231, 2246, 138 L.Ed.2d 689 (1997)("the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.1997)); Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)), (3) to enhance access to the courts "by spreading litigation costs among numerous litigants with similar claims[,]" id. (citing United States Parole Comm'n v. Geraghty, 445 U.S. 388, 402-403, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)), (4) "[to protect] the defendant from inconsistent adjudications[,]" id., and (5) "to ensure ... that the interests of absentee class members are considered fairly and adequately," id. (citing Hansberry v. Lee, 311 U.S. 32, 42-43, 61 S.Ct. 115, 85 L.Ed. 22 (1940) and Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 55 (3rd Cir.1994)).

Rule 23's requirements for class action suits should be interpreted in light of the basic purposes of the rule. In re A.H. Robins Co., 880 F.2d 709, 740 (4th Cir.), cert. denied, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); see also Mace, 109 F.3d at 344; Andrews v. Amer. Tel. & Tel. Co., 95 F.3d 1014, 1025 (11th Cir.1996); 5 MOORE, supra, at § 23.04.

The Advisory Committee pointed to, as the outstandingly clear or typical example or archetype of a case eligible for (b)(2) certification, "actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." Id. (collecting civil rights cases including Potts v. Flax, 313 F.2d 284 (5th Cir.1963) and Bailey v. Patterson, 323 F.2d 201 (5th Cir.1963), cert. denied, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964)). In fact, "Rule 23(b)(2) was promulgated ... essentially as a tool for facilitating civil rights actions." 5 MOORE, supra, § 23.43[a], at 23-191. Under the majority's bright-line rule, however, no consideration is given or importance attached to the fact that the case not only qualifies under the text of Rule 23(b)(2), but also is a civil rights action seeking to permanently enjoin unlawful discrimination. Cf. Jenkins v. United Gas Corp., 400 F.2d 28, 32-33 (5th Cir.1968) ("[The claim to remedy class-wide discriminatory employment practices] has extreme importance with heavy overtones of public interest."); Young v. Pierce, 544 F.Supp. 1010, 1028 (E.D.Tex.1982)("[W]hen the relief sought is injunctive relief, the benefits ... would inure not only to known class, but also to a future class of indefinite size."); Note, Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2), 88 Yale L.J. 868, 873 n.32 ("The desirability of an injunction to shield all putative class members against whom the discrimination was by its 'very nature' directed, provided the 'most important' reason for upholding class treatment in the (b)(2) situation.") (citing Potts v. Flax, 313 F.2d 284, 289 (5th Cir.1963) and Bailey v. Patterson, 323 F.2d 201, 206-07 (5th Cir.1963)).

Rule 23(b)(2) provides that "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition [ ] the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]"

The Supreme Court, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, ----, 117 S.Ct. 2231, 2235, 138 L.Ed.2d 689 (1997), held that federal courts "lack authority to substitute for Rule 23's certification criteria a standard never adopted by the rulemakers--that if a settlement is 'fair,' then certification is proper.". For, as the Supreme Court admonished:

And, of overriding importance, courts must be mindful that the rule as now composed sets the requirements they are bound to enforce. Federal Rules take effect after an extensive deliberative process involving many reviewers: a Rules Advisory Committee, public commenters, the Judicial Conference, this Court, the Congress. See 28 U.S.C. §§ 2073, 2074. The text of a rule thus proposed and reviewed limits judicial inventiveness. Courts are not free to amend a rule outside the process Congress ordered, a process properly tuned to the instruction that rules of procedure "shall not abridge ... any substantive right." § 2072(b).

Several decisions and those of the Supreme Court have held that the district court, within the bounds of the Federal Rules, has broad discretion to decide whether to allow the maintenance of a class action; that inherent in that discretion is the district court's duty to rigorously analyze each case to determine whether the certification prerequisites have been satisfied; and that the district court, when necessary, must probe behind the pleadings before coming to rest on the certification question. *General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160-161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). As this court, in *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996), recently held:

A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Applewhite v. Reichhold Chems.*, 67 F.3d 571, 573 (5th Cir.1995). The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23. *Gulf Oil*

*Co. v. Bernard, 452 U.S. 89, 100, 101 S.Ct. 2193, 2200, 68 L.Ed.2d 693 (1981).*

*NEWBERG, supra, § 4.14 (discussing these approaches with approval and collecting cases therein); 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1775, at 470 (2d ed. 1986) ("If the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2). Those aspects of the case not falling within Rule 23(b)(2) should be treated as incidental.").*

*Title VII suit against discriminatory hiring and promotion policies is necessarily a suit to end discrimination because of a common class characteristic, [such as race but not limited to it]. Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719 (7th Cir.1969); Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir.1968). The conduct of the employer is actionable "on grounds generally applicable to the class," and the relief sought is "relief with respect to the class as a whole." The class, all sharing a common characteristic subjected to discrimination, is cohesive as to the claims alleged in the complaint. Thus, a Title VII action is usually particularly fit for (b)(2) treatment, and the drafters of Rule 23 specifically contemplated that suits against discriminatory hiring and promotion policies would be appropriately maintained under (b)(2). Advisory Committee, supra at 102.*

*A (b)(2) class is appropriate in a Title VII suit where both final injunctive and monetary relief are granted. See Franks v. Bowman Transp. Co., 495 F.2d 398, 422 (5th Cir.1974); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 257 (5th Cir.1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1375 (5th Cir.1974); Robinson v. Lorillard Corp., 444 F.2d 791, 801-802 (4th Cir.1971); Bowe, 416 F.2d at 720. The basic nature of a Title VII suit has not been altered merely because the plaintiff may also pray for compensatory or punitive damages, if money damages are not the exclusive or dominant relief sought.*

*After the 1991 Civil Rights Act the thrust of a Title VII action continues to be society's interest in eliminating discrimination and the individual's interest in being made whole. H.R.Rep. No. 102-40(I), at 64-65, reprinted in 1991 U.S.C.C.A.N. 549, 602-03. Title VII plaintiffs may still seek extensive and systematic injunctive relief for claims that arise from a system of employment action that has been uniformly imposed based on a characteristic common to all class members, such as race. Therefore, "[t]he conduct of the employer is still answerable 'on grounds generally applicable to the class,' and the primary relief sought is still 'relief with respect to the class as a whole,' " Wetzel, 508 F.2d at 251, even when nonpredominant money damages are sought. Cf. Thomas v. Albright, 139 F.3d 227, 1998 WL 135494, 234-35 (D.C.Cir. 1998) (assumption of cohesiveness underlying certification of a (b)(2) class is not necessarily destroyed when claims for injunctive relief are coupled with individual claims for monetary damages).*

*Because equitable relief and legal claims may depend on common issues of fact, the court must allow the jury to determine in stage I the issue of legal liability to the class before the court determines whether the class is entitled to injunctive or declaratory relief. See Dairy Queen v. Wood, 369 U.S. 469, 479-480, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Also, in stage II, the court must clearly instruct the jury that it is not to revisit the issues decided by the jury in the first phase as to whether the defendant had an employment policy of unlawful discrimination but must decide only the issues of whether individual plaintiffs are entitled to compensatory or punitive damages. See Gasoline Products Co., Inc. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)*

*The first stage of a Title VII class action focuses exclusively on class-wide claims, Price Waterhouse v. Hopkins, 490 U.S. 228, 245 n. 10, 109 S.Ct. 1775, 104 L.Ed.2d 268 (The focus in Stage I is " 'not [ ] on [the] individual hiring decisions, but on a pattern of discriminatory decisionmaking.' ") (quoting Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876, 104 S.Ct. 2794, 81*

*L.Ed.2d 718 (1984)), whereas the second stage focuses on individual claims.*

## II. EVENTUAL CLASS ACTION ALLEGATIONS

Plaintiffs file this action with standing as follows:

Lead Plaintiff, as he is personal member of the Class, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[2] According to the Venezuelan Law for the Promotion and Development of Small and Medium Industry and Social Property Units, the company will be:

Small Industry when it has an average annual payroll of up to fifty (50) workers or with an annual billing of up to one hundred thousand Tax Units (100,000 TU).
Medium Industry when they have an average annual payroll of up to one hundred (100) workers or with an annual billing of up to two hundred and fifty thousand Tax Units (250,000 TU).



b.    Questions of law and fact are common to the Class, including but not limited to the following: :

The class members have suffered the same injury or type of injury as a result of  actions of the Defendants, specifically from the actions derived from the orders, instructions, statements and policies implemented by principals of the Defendants, its subsidiaries and contractors with regards to the member of the class, namely the workers of Defendants, its subsidiaries, affiliates and contractors due to the instructions given and held by the presidents of PDVSA, CITGO, managers, directors and other principals from 2002 to this date, as well as Hugo Chavez and Nicolas Maduro as presidents of

Venezuela, as well as of the ministers in charge for the energy sector, the authorities of and officers of Defendants, as well as the presidents and executives of other Venezuelan Government, Venezuelan Judiciary, Venezuelan Legislative and other State bodies.

Defendants acted or conspired with co-conspirators to fire, deny rights to the workers, fraudulently conceal assets to avoid collection from the Plaintiffs or any other affected by the wrongdoings of Defendants.; Defendants and co-conspirators' conduct caused injury to the business and property of Plaintiffs and the members of the Class;

The amount of aggregate damages suffered by the Class as a whole is of consideration;

The Class suffered discrimination injury, political persecution injury;

Defendants were unjustly enriched to the detriment of the Class, entitling the Class to disgorgement of all monies resulting therefrom; and the Class is entitled to restitution and/or disgorgement, in addition to, or as a substitute for, damages under applicable United States and Venezuelan law.

The Claims of the Plaintiffs are typical of the Class: The claims of the class representatives are typical of the claims of the class members. because all members of the Class were injured, and may continue to

be injured, in the same or similar manner by Defendant and co-conspirators' unlawful, criminal and inequitable methods, acts, and practices, i.e., they have persecuted and performed sustainable damage to the Class since 2003 to this date. Moreover, the defenses would involve common issues with respect to the Plaintiffs and the Class members.

d.    The Plaintiffs will fully and adequately protect the interest of all members of the Class. The class representatives are adequate to represent the interests of the class members as former workers of PDVSA, its subsidiaries and SME contractors. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

The Plaintiffs have no interests that are adverse to, or in conflict with, those of the Class, on the contrary a long standing career in defense of the Class characterizes decades of work by ███████████████

████████████████████████████████████████████

██████████████████████████████████



e. The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members.

f.      For the Plaintiffs and the members of the Class bringing this action, a class action is equivalent or superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all workers and firms affected in the United States, Venezuela and worldwide would be impracticable. The Class is readily definable and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims that would otherwise be too small to support the expense of

individual complex litigation. That a large number of the class members are domiciled in Venezuela is an obstacle as well for such potential claimants to obtain redress. The class members will be given adequate notice of the class action, including those who live in Venezuela. The Plaintiffs have the necessary means to communicate with the class members.

Eventually the court could rule to certify the following classes of plaintiffs, adding, combining or elimination, or other measure as the court might deem proper:





The eventual Benefits of Class Action Certification:

Class action certification would allow the class members to obtain justice in a fair and efficient manner. It would also save the time and expense of having to litigate each individual claim.

In the eventuality the court considers that a class action certification can not be granted at the moment, Plaintiffs pray the court to proceed with their joint claims as hereby documented.

52. As early as 2004 it was of public knowledge that persecution of oil workers was extremely harsh as can be read in the "Current situation of employees of the state oil company Petróleos de Venezuela (PDVSA) who were discharged following their participation in strikes during December 2002 and April 2003; work reintegration; access to the public service and the private sector; whether private companies are instructed not to hire workers

fired by PDVSA; remedies undertaken" by:

https://www.refworld.org/docid/41501c7215.html: This report by the :

Canada: Immigration and Refugee Board of Canada and recognized by the

UN Refugee Agency (UNHCR) provides information on the situation of

PDVSA workers who were dismissed for their participation in strikes in

2002 and 2003. : https://www.refworld.org/docid/41501c7215.html

53. **Plaintiffs will send the court, once and if efiling rights are granted, or as required by court, with a list of no less than two hundred sworn affidavits recorded by potential plaintiffs expressing their intention to join or similar into the case.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **have in viva voce sworn the following affidavit:**

54. *"The following text from the body of the Affidavit expresses my situation:*

*I, the undersigned former employee of PDVSA or its subsidiaries, with date of first employment, date of de facto termination and last position held in said company or subsidiaries, as indicated in the annex to this*

*Affidavit to the extent that corresponds to me, I hereby declare under penalty of perjury the following:*

*1. I intend to file a joinder or similar action in this honorable court of justice, to consolidate the case related to the Violation of Human Rights and Workers' Rights presented by Mr. Iván R. Freites and others against Bolivarian Republic of Venezuela, PDVSA, CITGO and others.*

*2. I am fully aware of the relevance of the case to my own situation, with regard to the risk of making illusory any expectation of injunctive or other remedies for damages caused by the defendants, especially given the circumstances of the Crystallex International case Corporation v. Bolivarian Republic of Venezuela Case Number: 1:17-mc-00151-LPS in the District of Delaware.*

*3. This action arises from extensive damages inflicted on individuals, including engineers, technicians, skilled workers, and contractors, who were employed or contracted by Defendants at various facilities in Venezuela and throughout the Americas. These violations spanned from 2003 to the present and included services at PDVSA facilities such as oil refineries in El Palito, Amuay, Cardón, Bajo Grande,*

Puerto La Cruz, Barinas, PDVSA Joint Ventures and PDVSA Petroleum Exploration and Production, among others. others.

4. I was unfairly fired, had my contract de facto canceled, and PDVSA officials unfairly prohibited me from seeking employment within PDVSA Corporation or its subsidiaries, in Venezuela, the United States, and Europe.

5. The Plaintiffs in Mr. Iván R. Freites' Lawsuit allege that PDVSA violated employment contracts by failing to pay our full salaries and benefits, mismanaging the workers' pension fund, violating contract terms related to housing, and other benefits, and engaging in a variety of other harmful activities, which are basically the same evils that I suffered from PDVSA and other defendants.

6. Additionally, PDVSA and its subsidiaries have benefited from unjust enrichment through withholdings, salaries, contractor equipment, unpaid and unprocessed invoices, and other funds owed to workers like me. This unjust enrichment represents substantial sums that have been improperly withheld.

7. Several of the plaintiffs, including myself, were denied our right to work by the defendants and co-conspirators as an act of political

retaliation. They confiscated our properties and subjected us to physical and psychological harm.

8. The defendants have unlawfully caused serious injuries and deprived me and thousands of workers of our right to justice.

9. I will allege and provide evidence that CITGO played an instrumental role in these actions and collaborated with the Defendants, which include the Government of the Bolivarian Republic of Venezuela, Petróleos de Venezuela, S.A. (PDVSA), PDV Holding, PDV America, and others, by carrying out these illegal actions against Workers and other people in similar situations.

In accordance with the principles of justice, equity and protection of human rights, I hereby affirm the truth of the statements contained in this Affidavit and express my intention to seek redress through this honorable court of law.

With filling date according to Google Forms Timestamp.



Screenshot (one of several) showing different affected workers providing their sworn statement on the Affidavit.

55. Given that it could be so considered by the court that all conditions for a class action process are met, Plaintiffs pray the court to certify a Class Action certification or similar action.

56. In the eventuality the court does not consider the class action process as proper, Plaintiffs pray the court to proceed with the joint case of Plaintiffs.

57.

### CLAIMS FOR RELIEF

58. The Plaintiffs seek injunctive relief and pray the court to enjoin Defendants from continuing to violate the Plaintiff's rights; That Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein; or from entering into any other conspiracy alleged herein, or from entering into ·any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

59. That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendant as a result of their acts of unjust enrichment, or any acts in violation of laws of fiduciary duties; That Plaintiffs be awarded their damages, in an amount according to injury.

60. That Plaintiffs be awarded proper interest for damages after the date determined by the court;

61. That Plaintiffs recover their costs of suit including translation costs, accountants, financial and other advisors costs and reasonable attorney's fees; and

62. That the Court grant other legal and equitable relief as it may deem just and proper under the circumstances, including such other relief as the Court may deem just and proper to redress, and prevent recurrence of, the alleged violation to dissipate the effects of Defendant's violations.

63. Order Defendants to pay damages to Plaintiffs in an amount to be determined during the process; and grant such other relief as the Court may deem just and equitable.

64. The Plaintiffs seek ███████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████
████████

65. In the case of the putative Class Members, a proper settlement for each of the putative Class Members would allow a complete settlement of the case and avoid costly litigation and further damages.

66. It is to be noted *prima facie* that a large majority of class members are persons of over 60 years of age, in conditions of hardship at the moment due to the wrongs inflicted by Defendants upon them.


## STATEMENT OF THE IDENTITY OF THE PLAINTIFFS, OUR INTEREST IN THE CASE, AND THE SOURCE OF OUR AUTHORITY TO FILE

67. We, the Plaintiffs state as follows: Identity of Plaintiffs, interest in the case and source of authority to file are stated in Appendix I and considered hereby reproduced.

68. Plaintiffs pray the court for Seal and Reserve of their identities with respect to the Public.

69. In the case of ██████████████████████████████████████, *in chambers* seal of their identity is prayed to the court.

70. Plaintiffs pray the court for in chambers reserve of identity of all Potential Plaintiffs and wronged parties and persons that Plaintiffs bring to the attention of the court.

## **COMMENTS ON THE LEGAL AND DE FACTO RELATIONSHIP**

## **AMONG SOME OF THE DEFENDANTS.**

71. According to documents filed with the World Bank's arbitration court, US Owens-Illinois, in a case known to this court filed on February 9th, 2019. Plaintiff Owens-Illinois claimed while PDVSA Holding, Citgo Holding, and Citgo Petroleum were "nominally Delaware corporations," in reality they were "alter egos, and mere instrumentalities of Venezuela itself".

72. According to the decision of the UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT Case: 23-1647,  is  based on the finding that the opposition-led interim government had used Citgo as its instrumentality, as had also the Chavez and Maduro Administrations done since 2003. Judge Leonard Stark's 61-page opinion reads: "The Guaidó Government has accessed PDVSA's US subsidiaries' assets in the United States and used them to fund itself, bypassing any right PDVSA may have had to corporate dividends. The Guaidó Government has also used PDVSA assets to fund Venezuela's legal Defense . . . PDVSA has started, only later to stop, paying its debts at the direction of Venezuela. President Guaidó announced that he intends to treat Venezuela's debts and PDVSA's debts the same in an eventual debt restructuring."

73. In the field of political persecution of opposition members, it has been shown by reports of International Labor Organization, dated 2004 to reports as recent as 2022 that opposition members, union leaders, union members and all type of workers have been persecuted by PDVSA, CITGO in cooperation with the Venezuelan government.

74. In general terms the US State's Attorney for Southern District of Texas and the US Department of Justice ROBERT ZINK Chief of Fraud Section of Criminal Division have charged CITGO with criminal charges as foreign officials according to the FCPA. in the Case 4:20-cr-00305 *SEALED* filed in the UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION in july 2020. stated,

    a. Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan stateowned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for, among other things, the exploration, production, refining, transportation, marketing, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. PDVSA and its wholly-owned subsidiaries, were owned and controlled by, and performed functions of, the Venezuelan government, and were "instrumentalities" of a foreign government as that term is used in the

Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

b. Citgo Petroleum Corporation ("Citgo"), based in Houston, Texas, was a wholly-owned subsidiary of PDVSA that acted primarily as a refiner, transporter, and marketer of petroleum-based products, but also procured goods and services on behalf of PDVSA through its Special Projects group. Citgo was indirectly owned and controlled by, and performed functions of, the Venezuelan government, and was an "instrumentality" of a foreign government as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd3(f)(2)(A).

75. In the United States District Court Southern District of Florida case 22-20552-CR, United States of America v. David RIVERA it was established that CITGO paid several million USD to U.S. Politicians in order to launder the reputation of the Venezuelan Government as recent as 2017, in violation of the Foreign Agents Registration Act and other laws.

76. It has been established and accepted in this District Court of Delaware that CITGO, PDVSA and the Venezuelan government are to be considered as *alter ego* of one another in several cases but that such condition of *alter ego* is to be considered and decided with respect to each case.

77. Plaintiffs have been directly affected by the wrongdoings of Defendants.

78. All above mentioned legal reasonings can be a guide to conclude that while performing commercial activities in the United States and Venezuela, CITGO, PDVSA and all Defendants engaged in a pattern of human rights violations.

79. While Alter ego doctrine is to be evidentiated in each and every case, in this case brought to the attention of the Court shows without need to recurr to Alter ego allegations, that Defendants engaged in the illegal activities alleged by Plaintiffs, not as alter ego of the Republic of Venezuela (which they may or may not have been at any given point in time) but as the legal entities they are and for which their actions and omissions they are to answer.

## 80. APPLICABLE LAW, JURISDICTION AND VENUE

### 81. Applicable Law

82. Procedural Law is that of the United States, the FRCP and the State of Delaware under Federal Rules of Civil Procedure when applicable.

83. Under FRCP 44.1 ; Del. Cod. C. Proc. 44.1; Plaintiffs pray the court to rule that applicable Law is the Law of the country of Republica Bolivariana de Venezuela, as in the context of federal court proceedings, Federal Rule of Civil Procedure 44.1 ("Rule 44.1") provides procedural guidance for the

application of foreign law in federal court.  Rule 44.1 states that: "**[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law. "**

84. Plaintiffs bring to the attention of the Court that Venezuela is bound by a number of international agreements with regards to Trade Unions Law, Workers Law (the ILO 1958 Convention) to which the US is also part; that Venezuela is bound by a number of international agreements with regards to Human Rights to which the US is also part as the Universal Declaration of Human Rights (UDHR 1948), the  International Covenant on Civil and Political Rights (ICCPR ratified by the US in 1992) ; the  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT, U.S. ratified CAT in 1994 ):  relevant to the case. In the case of Plaintiffs Leading Plaintiff and Ivan FREITES the  1951 Refugee Convention and its 1967 Protocol. are also applicable.

85. Furthermore Venezuelan Law expressly prohibits discrimination of any sort based on political grounds.When an action is brought upon a cause arising

outside of the jurisdiction, it always should be borne in mind that the duty of the court is not to administer its notion of justice, but to enforce an obligation that has been created by a different law. Cuba R. Co. v. Crosby, 222 U.S. 473 (1912); Slater v. Mexican National R. Co., 194 U. S. 120, 194 U. S. 126. With very rare exceptions, the liabilities of parties to each other are fixed by the law of the territorial jurisdiction within which the wrong is done and the parties are at the time of doing it. American Banana Co. v. United Fruit Co., 213 U. S. 347, 213 U. S. 356. See Bean v. Morris, 221 U. S. 485, 221 U. S. 486-487., federal courts sitting in diversity apply the federal rule so long as it does not violate the Rules Enabling Act, 28 U.S.C. § 2072, by abridging, enlarging or modifying any substantive right–including substantive rights guaranteed under state law.

**86. Jurisdiction and Venue.**

87. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, which provides that federal courts have jurisdiction over civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiffs are residents and domiciled in ████████████████████ ████████████████████████████. Defendants CITGO Holding,

CITGO Corporation, PDV Holdings and PDV America are established in Delaware. Therefore, the Court has subject matter jurisdiction over this action.

88. The Court also has personal jurisdiction over the Defendants. Several of the defendants are a Delaware corporation and have sufficient contacts with the State of Delaware to establish personal jurisdiction. Additionally a number of trials involving the Defendants are currently pending in Delaware Courts (See 879 F.3d 79 United States Court of Appeals, Third Circuit. CRYSTALLEX INTERNATIONAL CORP.v.PETRÓLEOS DE VENEZUELA, S.A.).

89. Venue is proper in this Court under 28 U.S.C. § 1391(b) as Defendant resides in this District. Further, a substantial part of the events or omissions giving rise to the claim herein occurred in this District.

90. Venue is proper in this action in the District of Delaware pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(f)(3).. Defendants CITGO and PDV America are subject to personal jurisdiction in the District of Delaware and a substantial part of property that is subject of the action is situated in the District of Delaware.

91. Personal jurisdiction in this District is proper over Defendant pursuant to Del. C. § 321(a), 10 Del. C. § 3111, and Federal Rule of Civil Procedure 4(k).

92. Plaintiffs bring this case to the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, given the foreseeable connections of an eventual decision in favor of Plaintiffs with Case No: 1:17-mc-00151 CRYSTALLEX INTERNATIONAL CORP., v. BOLIVARIAN REPUBLIC OF VENEZUELA, PETRÓLEOS DE VENEZUELA, S.A. et al.

## 93. THE PARTIES

## 94. Plaintiffs

95. Plaintiffs are identified in Attachment I, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

## 96. Defendants

97. **Defendant Petróleos de Venezuela, S.A. (PDVSA)** is a "corporation owned by the Bolivarian Republic of Venezuela and subordinated to the Venezuelan state," and "supervised and controlled by the Ministerio del Poder Popular

para el Petróleo - People's Power Ministry of Petroleum." Its business activities and interests in the United States are represented by Defendant "Junta Administradora Ad-Hoc de PDVSA" with the following address as per the Foreign Assets Registration Act Register: **Petróleos de Venezuela, S.A.**, Mr. Horacio Medina 2216 Adams Street #307, Hollywood, FL 33020

98. **Defendant PDV Holding, Inc.** is a Delaware corporation (State of Delaware Division of Corporations File 2742595) with its principal place of business at 1293 Eldridge Parkway, Houston, Texas 77077 and with the following address as per the Foreign Assets Registration Act Register: PDV Holding, Inc. Mr. Horacio Medina 2216 Adams Street #307, Hollywood, FL 33020 . Defendant is a wholly-owned direct  subsidiary of Petróleos de Venezuela, S.A., a foreign corporation wholly owned and controlled  by Venezuela. Defendant, in turn, wholly owns CITGO Holding, a Delaware corporation with  the same address. It is controlled by Defendant "Junta Administradora  Ad-Hoc  de  PDVSA" a.k.a "PDVSA Ad-Hoc". The following graph taken from the PDV Holding webpage on Aug.28.2023 indicates:



PDV Holding, Inc., a United States subsidiary of the Venezuelan National oil and gas company, Petróleos de Venezuela, S.A. ("PDVSA"), is a non-operating stock holding company incorporated in Delaware and headquartered in Texas. PDVH is the indirect sole stockholder of CITGO Petroleum Corporation, through ownership of 100% of the shares of its direct subsidiary CITGO Holding, Inc. (CITGO Holding, Inc. is the sole stockholder of CITGO Petroleum Corp.)

99.

100. **Defendant PDV America, Inc.** ("PDV America" or the "Company" and, together with its subsidiaries, the "Companies") was incorporated in 1986 in the State of Delaware and is a wholly owned subsidiary, effective April 2, 1997, of PDV Holding, Inc. ("PDV Holding"), a Delaware corporation. The Company's ultimate parent is Petroleos de Venezuela, S.A. (together with one or more of its subsidiaries, referred to herein as "PDVSA"), the national oil company of the Bolivarian Republic of Venezuela. Through its wholly owned operating subsidiaries, CITGO Petroleum Corporation ("CITGO") and PDV Midwest Refining L.L.C. ("PDVMR") (see below), PDV America refines, markets and transports petroleum products, including gasoline,

diesel fuel, jet fuel, petrochemicals, lubricants, asphalt and refined waxes, mainly within the continental United States.

101.   **Defendant Junta Administradora Ad-Hoc de PDVSA** a.k.a "PDVSA Ad-Hoc" is the legal entity in charge of all matters relating to Petroleos de Venezuela S.A. in the United States and other countries as designated by the Asamblea Nacional de Venezuela in February 2019.

102.   **Defendant CITGO Petroleum Corporation:** CITGO Petroleum Corporation ("CITGO") (1293 Eldridge Parkway, Houston, TX 77077) is an energy corporation incorporated in Delaware (State of Delaware Division of Corporations File 2005114). It is wholly owned by Citgo Holding, Inc.

103.   **Defendant CITGO Holding:** (1293 Eldridge Parkway, Houston, TX 77077) is an energy corporation incorporated in Delaware (State of Delaware Division of Corporations File 2107402) is a wholly-owned operating subsidiary of PDV America, Inc. ("PDV America"), a wholly indirectly owned subsidiary of Petroleos de Venezuela, S.A. ("PDVSA", which may also be used herein to refer to one or more of its subsidiaries), the national oil company of the Republic of Venezuela.

104.   **Co Conspirators**

105. **CoConspirators 1:** SERVIFERTIL, INTESA, Bariven, PALMAVEN, S.A.Corpoven, S.A., Pequiven, S.A.; Petropiar, S.A.; Petromiranda, S.A.; Petromonagas, S.A.; Petroanzoátegui, S.A.; Petrodelta, S.A.; Petrocaribe, S.A.; CITGO Petroleum Corporation; PDVSA Gas, S.A., PDV Marina; PDVSA Gas; PDVSA Comunal Collectively addressed as "PDVSA et al" are wholly-owned operating subsidiaries of Petroleos de Venezuela S.A. and share the same Registered Address with Petroleos de Venezuela S.A.

106. **Co Conspirators 2:** Asociación Estratégica Cerro Negro, Sincrudos de Oriente, S.A. (often just referred to as Cerro Negro), Shares: PDVSA (41.67%), ExxonMobil (41.67%), and BP (16.66%) after nationalization became known as PetroMonagas; Petrozuata C.A. between PDVSA (49.9%) and ConocoPhillips (50.1%); Asociación Estratégica Hamaca, Petrolera Ameriven, S.A. (commonly known as Ameriven), Original Shares: PDVSA (40%), ChevronTexaco (now Chevron) (30%), and Phillips Petroleum Company (which later merged to become ConocoPhillips) (30%), after nationalization it was renamed: Petropiar C.A.; Asociación Estratégica Sincor, Petroalianza Sincrudos del Orinoco C.A. (often simply called Sincor), Original Shares: PDVSA (38%), TotalFinaElf (now Total) (47%), and Statoil (now Equinor) (15%), after nationalization renamed as Petrocedeno: Collectively addressed as "PDVSA Joint Ventures"

107. **Co Conspirators 3:** ExxonMobil, British Petroleum, Conoco, Chevron, TOTAL, Statoil, Repsol, Marathon Collectively addressed as "PDVSA Associates"

108. **Co Conspirators 4:** Siemens Venezuela, Siemens Energy, Collectively addressed as "Corruption Facilitators". Defendant SIEMENS S.A. (VENEZUELA) ("SIEMENS VENEZUELA"), headquartered in Caracas, Venezuela, was a wholly owned subsidiary of Siemens Aktiengesellschaft ("Siemens"), a corporation organized under the laws of Germany with its principal offices in Berlin and Munich, Germany. Through its operating groups, subsidiaries, officers, directors, employees, and agents, Siemens was engaged in a variety of business activities for, among others, national, state, and municipal governments. This included, among other things, developing, constructing, selling, and servicing telecommunications equipment and systems; power generation, transmission, and distribution equipment and systems; transportation equipment and systems; medical equipment and systems; and industrial and traffic equipment and systems. SIEMENS VENEZUELA was a regional company that contracted for and managed projects relating to all Siemens operating groups. According to the U.S. Securities and Exchange Commission in a release dated December 15th, 2008 that reads "Washington, D.C., Dec. 15, 2008 — The Securities and

Exchange Commission today announced an unprecedented settlement with Siemens AG to resolve SEC charges that the Munich, Germany-based manufacturer of industrial and consumer products violated the Foreign Corrupt Practices Act (FCPA) by engaging in a systematic practice of paying bribes to foreign government officials to obtain business." Siemens was in violation of FCPA and RICO in several countries including Venezuela and relates to this case. Siemens has benefited from its wrongdoings and schemes of corruption and bribery in Venezuela. Plaintiffs have requested Siemens to refrain from pretending to collect allegedly due monies from assets of Venezuela, PDVSA and similars (see. Letter from Siemens in Crystallex International Corp. v. Bolivarian Republic of Venezuela D. Del. C.A. No. 1:17-mc-00151-LPS ) in  obtaining gains in relation to their wrongdoings in the country until an injunctive relief is provided by Siemens to the people of Venezuela together with compensation to be determined or agreed.

109. **Francisco a.k.a. "Pancho"  Illaramendi;** was sentenced January 29, 2015 by U.S. District Judge Stefan R. Underhill in Bridgeport to 156 months of imprisonment, followed by three years of supervised release, for orchestrating a Ponzi scheme that defrauded investors and creditors of hedge funds he managed out of hundreds of millions of dollars, and for obstructing

the ensuing investigation of his conduct. It is believed Defendant is imprisoned under federal custody.

110. **Kenwood Management Group;** Under receivership, see   S.E.C. v. Illarramendi, No. 3:11-cv-00078, 2014 .

111. **Co Conspirators 5:** Rafael Ramirez (Former President of PDVSA and Minister of Petroleum), Felix Rodriguez (former President of CITGO), Jose Alejandro Rojas (Former Minister of Finance), Collectively addressed as "Government Officers"; Francisco a.k.a. "Pancho" Illaramendi; Kenwood Management Group are individuals known to the US Courts and US Department of Justice for several cases of money laundering and violations of RICO and FCPA.

112. **Co Conspirator 6: The Bolivarian Republic of Venezuela (Venezuela).**

## SUMMARY OF ARGUMENT AND ARGUMENT

113.    All facts and allegations are based on information and belief.

114.    ██████████████████████████████████████████

██████████████████████████████████████

████████████

115.    ████████████████████████████████████████████

████████████████████████







129.

128.







134.

133.





135. [redacted]

136. [redacted]

137. [redacted]

138. [redacted]

139. [redacted]

140. [redacted]

141. [redacted]

142. [redacted]

143.

144.

145.

146.

147.

148.

149.

150.

151.







163.

162.

161.

164.

165. CITGO has collaborated with other Defendants and Co-Conspirators (República Bolivariana de Venezuela, PDVSA, PDV America, PDV Holding and others) in order to imprison workers. Some cases have been broadly discussed and are known to the public such as Tomeu Vadell, Dennysse Vadell and Cristina Vadell v. CITGO Petroleum Corporation, March 24, 2023, 4:2023cv01082, US District Court for the Southern District of Texas ) while hundreds of other cases are not yet publicly known. We pray the court to notice that this single claim is for an amount in excess of one hundred million US dollars, and being the case of dozens and hundreds of similar cases, relief would become unattainable for the injured.

166. In September of 2017, Tarek William Saab, Prosecutor General of Venezuela, began arresting PDVSA officers and managers on behalf of Maduro and Venezuela Saab arrested and imprisoned more than 50 PDVSA officers and managers by the time CITGO ordered several of its executives to travel to Venezuela in order to have them imprisoned, as stated in the case

known as "The CITGO six" . A clear evidence of the coordinated political activities done from and by CITGO on behalf of the Venezuelan government. See CAUSE NO. 2023-17486 TOMEU VADELL,      v. CITGO PETROLEUM CORPORATION IN THE DISTRICT COURT HARRIS COUNTY, TEXAS 334TH JUDICIAL DISTRICT. where it is alleged by claimant, and evidence provided that regarding Conspiracy and Aiding & Abetting, CITGO, PDVSA, and Venezuela sought to accomplish the objective of having six CITGO employees wrongfully arrested and imprisoned in retaliation for U.S. sanctions on Venezuela and  PDVSA, among other reasons. CITGO, PDVSA, and Venezuela reached a meeting of the minds on this objective when CITGO forced the executives to travel to PDVSA's offices in Caracas, Venezuela, and  then worked with Maduro to coordinate their arrest and imprisonment. The arrest and imprisonment were both unlawful and overt acts taken in pursuance of the objective of having them wrongfully arrested and imprisoned in retaliation for U.S. sanctions on Venezuela and PDVSA, among other reasons. Additionally, or alternatively, CITGO knowingly and substantially assisted with and participated in their unlawful arrest and detention, including, but not limited to, by sending them  to  Venezeula

on an alleged "business trip" under false pretenses, sending only CITGO

executives of Venezuelan-descent, and then remaining deliberately silent, rather than support, its innocent employee wrongfully detained abroad. As a result of CITGO's conspiring with, or knowingly and substantially assisting with and participating in their unlawful arrest and detention, the families of those affected have sustained, and continue to sustain, severe injuries and damages.

This case, as recent as it is, shows the role of CITGO in the continuous wrongdoings against Venezuelans in general and Venezuelan oil workers in particular.

**167.   According to statements of Horacio Medina, President of Defendant Junta Administradora Ad hoc de PDVSA the Venezuelan government with PDVSA as financial arm is " organized crime from power, with drug traffickers closely allied with them, with unlimited corruption that loots the country in all its expressions and that has an absolutely corrupt military leadership that participates in that looting."**

**168.   PDVSA is a criminal and terrorist entity according to its representative in the United States, Mr. Horacio Medina. No further discussion seems to be necessary upon such confession.**

169.   But it is not only looting but links to terrorist activities from PDVSA which have been expressly recognized by Venezuelan government high ranking officials, such as former Ambassador to Brazil (Republica Federativa do Brasil) Mrs. Maria Teresa Romero who specified on May, 20th, 2020 in the official web page of the Asamblea Nacional de Venezuela that "–It is no longer just a matter –Specifies Ambassador Romero– of the presence of Latin American terrorist groups such as the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), but also of extra-continental terrorist groups such as the Hezbollah group which also maintains a close relationship with the hierarchy that usurps power in Venezuela.

**170.   According to the diplomat, since 2007, when Maduro met in Damascus with Hassan Nasrallah, Secretary General of Hezbollah, the first commercial and criminal ties with the group were born. The Islamic Revolutionary Guard Corps (IRGC), led by Qasem Soleimani, who was discharged by the US on January 3, would have opened its subsidiaries in Venezuela and moved money through the state oil company, Petróleos de Venezuela, SA (PDVSA). ), using it to enter the international financial system and evade sanctions. "  The quoted**

**opinion is part of Attachment II and considered hereby reproduced in its entirety.**

171. It is to be noted that the IRGG is a Designated Foreign Terrorist Organization, designated as such on April 15, 2019, according to the U.S. DoS FTO List as of September 5th, 2023.

172. According to written statements in a detailed press article signed by **Horacio Medina, President of Defendant Junta Administradora Ad hoc de PDVSA the Venezuelan government and  PDVSA "those workers and union leaders who have dared to denounce this precarious situation and the calamitous operational realities of PDVSA are persecuted , their homes raided, repressed, imprisoned without prior trials; others have gone into exile or are in hiding. The cases of Guillermo Zarraga , Eudis Girot and Iván Freites serve as an example ."** Complete article is cited in Attachment II and hereby considered as reproduced in its entirety.

173. A number of workers dismissed from PDVSA were discriminated against by CITGO and were banned or blacklisted for employment in CITGO and other subsidiaries of PDVSA in the U.S. and Europe.

174. **The undisputed control of Tareck EL AISSAMI, PDVSA President in 2018 of PDVSA and CITGO operations, being Tareck EL AISSAMI a US Sanctioned individual.**

175.   It is to be noted that Mr. Asdrubal Chavez was at or about the same time Vice President of Human Resources in PDVSA (Caracas), Member of the Board PDVSA (Caracas), **Member of the Board (CITGO),** President of CITGO Petroleum, President of PDVSA (Caracas) and Minister of Oil. In all these positions Mr. Chavez actively participated in the discrimination against workers and contractors for political reasons.

**176.   Political operators and persecutors of opposition such as,**

**Mr. Orlando Chacin ("Chacin") was at all relevant times a director of both PDVH and CITGO Holding. Case 4:18-cv-01458 Document 1 Filed in TXSD on 05/07/18 Page 5 of 59 - 6 - 23. ; Jesus Luongo ("Luongo") was at all relevant times a director of PDVSA (Venezuela), PDVH and CITGO Holdings.**

**Mr. Eulogio del Pino ("Pino") was at all relevant times a director, chairman of the board and president of CITGO Holding, PDVSA Director, PDVSA (Venezuela) President.**

**Mr. Nelson Martinez (deceased) was at all relevant times either a director, chairman of the board and president of CITGO Holding, PDV America, PDVSA Director, PDVSA (Venezuela) President, Minister of Oil and Energy in the Maduro regime.**

**In all these positions in the U.S. as CITGO officers and in Venezuela as PDVSA officers, these political operators actively participated in the discrimination against workers and contractors for political reasons.** This is clear evidence of the political assignments of CITGO on behalf of PDVSA, and the wrongful duties performed by CITGO against Venezuelans in general and the oil industry workers in specific.

177.   CITGO, PDVSA and The Bolivarian Republic of Venezuela have acted as mirrors of one another with respect to Venezuela and a number of policies and tactics relevant to labor.  Furthermore, CITGO has been instrumental for many of PDVSA wrongdoings by providing coverage, financing and similar, and has collaborated with other Defendants in order to imprison workers. Some cases have been broadly discussed and are known to the public such as Tomeu Vadell, Dennysse Vadell and Cristina Vadell v. CITGO Petroleum Corporation, March 24, 2023, 4:2023cv01082, US District Court for the Southern District of Texas ) while hundreds of other cases are not yet publicly known. **We pray the court to notice that this single claim is for an amount in excess of one hundred million US dollars, and being the case of dozens and hundreds of similar cases, relief would become unattainable for the injured.**

178. 

179. These decisions and actions have had a devastating impact on the lives of the affected persons. Many of them have lost their income, their homes, and their livelihoods. Some have had to emigrate from the country in search of opportunities, others have committed suicide linked to hardship, others have been evicted from their properties or housing when their property was located in or near PDVSA facilities. Children were banned from attending their regular schools as these children were the family of the wronged employees and contractors.

180. In the specific case of



184.

183.

182.

181.



185.  Additionally it is known to the public  that a number of high ranking government officers, including the President of Venezuela, Lt. Col. Chavez, the Minister of Oil, the President of PDVSA, the police, tribunals and all state powers threatened, imprisoned, killed, tortured, workers and other venezuelans on political grounds.

   a.  In December 2002, the President of PDVSA, Alí Rodríguez Araque, said that striking workers were "terrorists" and that they should be "shot."

   b.  In January 2003, the President of Venezuela, Hugo Chávez, said that striking workers were "traitors" and that they should be "fired."

   c.  In February 2003, Chávez ordered the military to take control of PDVSA and to remove striking workers from the company's facilities.

   d.  In March 2003, Chávez said that he would "break the necks" of striking workers.

These statements and orders led to a number of damages suffered by PDVSA employees and contractors, including:

e.  Termination of employment. Thousands of PDVSA employees were fired for participating in the strikes.

f.  Loss of wages and benefits. The terminated employees lost their wages, benefits, and pensions.

g.  Harassment and intimidation. Many employees were harassed and intimidated by the government and by pro-government groups.

h.  Physical violence. Some employees were physically attacked by pro-government groups.

i.  Psychological trauma. Many employees suffered and continue to suffer psychological trauma as a result of the events of 2003 and 2004.

j.  Psychological trauma. Many employees suffered and continue to suffer psychological trauma as a result of the illegal and violent process against any PDVSA employee, contractor or similar who is deemed by PDVSA or the Venezuelan government to be in favor of parties different from the government party, known as "opposition parties".

186.  The damages suffered by PDVSA employees and contractors were significant and long-lasting. The terminated employees have been unable to find new jobs, and they have struggled to make ends meet. The harassment and intimidation have created a climate of fear and uncertainty, and the

physical violence has left some employees with permanent injuries. The psychological trauma has made it difficult for some employees to function normally.

187. The statements and orders made by the President of PDVSA and the President of Venezuela in 2003 and 2004 were a violation of the rights of PDVSA employees and contractors. These statements and orders were also a violation of the law. The employees and contractors who were harmed by these statements and orders have a right to seek justice.

188. PDVSA also failed to provide Plaintiffs Ivan FREITES and Plaintiff 3 , Plaintiff 6 and Plaintiff 7 with adequate health insurance and retirement benefits.

**COMMENTS ON THE PDVSA PENSION FUND FRAUD**

189. Additionally a massive fraud was perpetrated against the Pension Fund of the PDVSA workers whereby in a fraudulent way a hedge fund headed by Francisco Illaramendi was appointed as the manager of the PDVSA Workers Retirement Fund in 2003. He was responsible for investing the fund's assets and ensuring that they were properly managed. See *S.E.C. v. Illarramendi*, No. 3:11-cv-00078, 2014 WL 545720 (D. Conn. Sept. 10, 2014).

190. The Board in charge of managing the  Pension Fund of the PDVSA workers was illegally appointed by PDVSA in 2014 in detriment of workers

interest as it became obvious with the total loss of the capital of the fund, in excess of several hundred million US Dollars.

191.   The Hedge Fund headed by Illaramendi engaged in a series of fraudulent activities that resulted in the depletion of the fund's assets. These activities included:

192.   Making unauthorized investments in risky and speculative assets.

193.   Using the fund's assets to pay for personal expenses.

194.   Embezzling money from the fund.

195.   Francisco Illarramendi, the Venezuelan-American venture capital manager who served as PDVSA's financial adviser, was sentenced to 13 years in prison for a pyramid fraud, in which much of the money belonged to the Pension Fund of the Venezuelan state-owned company.

196.   Illarramendi was accused of embezzling $20 million in a fraudulent scheme that fueled his friendships with high-ranking PDVSA officials. He was linked to the former president of the state oil company, Rafael Ramírez, and the former Finance Minister, José Rojas, to whom he was a close advisor.

197.   The fraud became known in 2011 when the federal court of the United States linked Francisco Illarramendi and Moris Beracha, also a Venezuelan financial operator, to designing a Ponzi or pyramidal scheme for $500

million, which consisted of capturing money from investors and using it for their personal benefits. , through a series of offshore companies, funds and banks in tax havens such as Switzerland and the Cayman Islands.

198.  Illarramendi used his firm Michael Kenwood Group (MKG) since 2006 to capture the money that he fed into his fraudulent scheme. John C. Carney, trustee appointed by the US court, assured that the financier took advantage of his contacts in PDVSA to pay millionaire bribes and obtain resources from the state Pension Fund between 2009 and 2010.

199.  After learning about the fraud, PDVSA restructured its board of directors, promised greater internal surveillance, joined the lawsuit against the Venezuelan financier and promised to assume the losses of its Pension Fund, which covers more than 2,400 people. PDVSA did not assume the losses of the Pension Fund.

200.  In 2011, Illarramendi pleaded guilty to the criminal charges to which he was accused.

201.  The SEC, the US stock market regulator, also participated in the lawsuit against Illarramendi by offering opaque data and transactions carried out by the operator in tax havens. It even helped to recover part of the funds granted by the affected investors.

202.   During the trial, the SEC accused the financier of paying $3 million to forge certifications in order to justify capital movements before the US authorities.

203.   Illarramendi is an economist graduated in the US and son of a Venezuelan diplomat. In 2005, he asked for a leave of absence from his work as an operator of the Credit Suisse bank to work as an executive advisor to PDVSA. He also participated as an advisor to the Ministry of Finance Mr. Jose Alejandro Rojas (Defendant).

204.   Sources that knew about the case linked "Pancho" Illarramendi with former Minister Ramírez and, especially, with José Alejandro Rojas, former Finance Minister during the government of Hugo Chávez. The relationship between these persons was fundamental for the fraud against the beneficiaries of the PDVSA Pension Fund.

205.   According to an official report from the Canadian Board for Refugees:

206.   In January 2003, the daily El Universal reported that Juan Fernández, the President of Petroleum People (Gente del Petróleo), a Venezuelan organization that represents the employees dismissed by the state oil company Petróleos de Venezuela (PDVSA) (Country Reports 2003 25 Feb. 2004, Sec. 2.b), refused PDVSA's offer to rehire the fired workers, and said that [translation] "freedom cannot be negotiated" (El Universal 16 Jan.

2003). Fernández also said that PDVSA had published a list of the dismissed employees' names in the national newspapers (ibid.; BBC Mundo 10 Feb. 2003). According to an article published by BBC Mundo, Fernández and Horacio Medina, another spokesperson for the employees, were also on the list (ibid.).

207.   See Attachment II on additional evidence on political persecution, murder, torture, etc. against Venezuelan workers and companies and others.

208.   These are just a few examples of the many statements made by the presidents of PDVSA and Venezuela that threatened violence against members of the opposition who worked for PDVSA. These statements have created a climate of fear and intimidation among PDVSA workers and Contractors, and have made it difficult for them to speak out against the government.


## TOLLING OF STATUTE OF LIMITATIONS AND RELATED ISSUES

209.   Extraordinary circumstances of Plaintiffs and the reasons on why it was not a sound possibility to take legal action against defendants is self-evident as it was life threatening for the Plaintiffs to insist in bringing legal actions while in Venezuela, as the repression of the Venezuelan regime has only worsened as years pass.



210.

211.

212.

213.

214.

215.   Plaintiffs, as Venezuelan citizens or residents, risk their life, limb and property by bringing this or any similar action while in Venezuela. Actually, Plaintiffs still fear they could face retaliation but given the latest changes in the recognition of Venezuelan authorities and the perceived risk of total insolvency by Defendants made the Plaintiffs decide to proceed in this action.

216.   Under the "continuing violations doctrine"' after Bodner v. Banque Paribas it is clear that not even the passage of several decades between the seizures and the institution of the plaintiffs' lawsuit dictate for dismissal of the claims pursuant to the applicable statute of limitations. In Bodner v. Paribas and to the defendants' surprise and chagrin, the court determined that if the plaintiffs' allegations were true, the statute of limitations had not yet

even begun to run on their claims.  Instead, the defendants' allegedly

ongoing refusal to pay the claimants proper compensation, return seized

property and return confiscated or wrongfully appropriated money  represent

a "continuing violation" of international law that persisted up through the

time of suit. The continuing violations doctrine thus breathed new life into

claims that otherwise might have accrued and expired more than a

half-century earlier. The basic theory behind the continuing violations

doctrine is that in some situations, continuing misconduct by a defendant

will justify

the aggregation or parsing of its misbehavior, with the effect of rescuing a

plaintiff's claim or claims from the statute of limitations. Yet this seemingly

straightforward principle has frustrated judges and litigants for many years,

for it has proven exceedingly difficult to determine which claims are

"continuing" in nature, and which are not. The United States Supreme Court

has stepped in to provide guidance as to specific causes of action, as it did

this past term in a Title VII case, Ledbetter v. Goodyear Tire & Rubber Co.

Plaintiffs allege and count on the favorable opinion of the court that, in

addition to any statute of limitation provision, this case fulfills the criteria

for tolling any statute of limitations that would be applicable in ordinary

circumstances on the "continuing tort doctrine", "continuing wrong doctrine" or "continuing violations doctrine".

Additionally the Alien Tort Statute does not provide for specific statute of limitations and the **Torture Victim Protection Act** (TVPA) 'calls for consideration of all equitable tolling principles in calculating [the statute of limitations] period with a view towards giving justice to plaintiff's rights.'" Because the TVPA allows for equitable tolling, courts have been asked to decide whether the ATS provides the same protection. Courts have decided unanimously that it does. The extraordinary circumstances required for equitable tolling are assessed on a case by case basis, but include "situations where the defendant misleads the plaintiff, allowing the statutory period to lapse; or when the plaintiff has no reasonable way of discovering the wrong perpetrated against her. . . ."

All evidence shows that a continuing wrong has been exerted by Defendants against Plaintiffs and against putative class members at least from 2003 until present.

**Extraordinary circumstances have also been found when the political climate of a country made the safe initiation of a law suit impossible, although the plaintiff is required to file the lawsuit within a reasonable time after the extraordinary circumstances are removed.**

**Therefore Plaintiffs pray the court can agree that limitation statutes are tolled under equitable tolling and justice considerations.**

**217.  LEGAL ALLEGATIONS AND CAUSE OF ACTION**

218.   The Plaintiffs allege the following.

219.   **ALLEGATIONS**

220.   Plaintiffs  file this action with standing as follows:

**221.**   Plaintiffs suffered similar damages due to similar actions from Defendants (Persecution, seizing of assets, etc.).

222.   Plaintiffs  have suffered the same type of injury as a result of  actions of the Defendants, as Defendants acted or conspired with co-conspirators to fire, deny rights to the workers, fraudulently conceal assets to avoid collection from the Plaintiffs or any other affected by the wrongdoings of Defendants;

223.   Plaintiffs suffered discrimination injury, political persecution injury;

224.   Defendant PDVSA was unjustly enriched to the detriment of Plaintiffs, entitling Plaintiffs to disgorgement of all monies resulting therefrom; and  as Plaintiffs are entitled to restitution and/or disgorgement, in addition to, or as a substitute for, damages under applicable US and Venezuelan law.

225.   Defendant CITGO financed a large number of illegal activities for PDVSA in the United States.

226.   The claims of the Plaintiffs are legitimate as they were injured, and may continue to be injured, in the same manner by the Defendants and unlawful, criminal and inequitable methods, acts, and practices, i.e., they have persecuted and performed sustainable damage to the Plaintiffs from 2002 to this date. Moreover, it is likely the defenses would involve common issues with respect to the Plaintiffs.

227.   Plaintiffs risk losing all and any possibility of recovery due to the financial situation of Defendants unless prompt action is granted by the court. Plaintiffs are to submit several motions for Writ of Attachment, motion for Declaration of Preferential Collection in favor of workers and others.

**228.   FIRST CAUSE OF ACTION - Contractual**

229.   Defendants violated the written contracts with Plaintiffs by *De facto* actions. Contracts were De facto terminated and compensation, due wages, due benefits, etc. were not paid.

230.   Breach of contract: PDVSA clearly failed to perform their obligations as outlined in the contracts with workers and contractors, all based in political motivations from PDVSA. The Plaintiffs allege and will beyond doubt establish the existence of valid contracts, their own performance and readiness to perform as well as the defendant's failure to perform, and

resulting damages. The Plaintiffs allege that PDVSA breached their employment contracts by failing to pay them their full wages and benefits, deprived them unlawfully of adequate health insurance;  failed to pay due invoices and proceeded on termination of contracts without just cause and without compensation to the wronged party.

231.   In summary with regards with the First Cause of Action the following assertions are made against defendants:

232.   Breach of Contract:

233.   Anticipatory Breach: PDVSA, in a *De facto* way communicated its intention to not fulfill  contractual duties before the performance was due in the case of agreed and contracted purchase orders, service orders and maintenance orders to the Plaintiffs. This gives the Plaintiffs the right to treat the contract as breached and pursue legal remedies for each of the breached contracts to each of Plaintiffs.

234.   As remedy, monetary damages are to be provided to Plaintiffs in order to restore the economic capacity of Plaintiffs.

235.   All in violation of the Decree with Rank, Value and Force of Organic Law on Labor, Men and Women Workers ("DLOTTT") establishes that it will be applicable to the employment relationship executed or agreed upon in Venezuela.

236.  All according to the Venezuelan Civil Code Section I: § 3° Of the effects of contracts, Civil Code Article 1159,  Title: Section I: § 3° Of the effects of contracts; Civil Code Article 1159, Contracts have the force of law between the parties. They cannot be revoked except by mutual consent or for reasons authorized by Law.; Civil Code Article 1160  Title: Section I: § 3° Of the effects of contracts; Civil Code Article 1160 Contracts must be executed in good faith and require not only compliance with what is expressed in them, but also all the consequences that arise from the contracts themselves, according to equity, use or the Law.

237.  Defendants acted against ███████████████████████ ███████████████████████████ ███████████████████████████████ ██████ newspaper ████████████████ deceased editor and politician Teodoro PETKOFF.

**238.  SECOND CAUSE OF ACTION-Tort-related causes of action**

239.  Fraudulent misrepresentation,

240.  The Defendant  PDVSA made a false representation regarding several material facts on which the Plaintiffs relied. Some of the facts fraudulently represented by the Defendants include the promise of fair treatment of the cases at a later date (see statements of PDVSA President Rafael RAMIREZ

and of Minister Ali Rodriguez above), the promise of compensation for seized property or the promise of returning or repairing the damaged property, and other well documented facts. The case of fraud against the PDVSA Workers Pension Fund was carried out with complicity and fraudulent misrepresentation to the Plaintiffs of the facts surrounding the fraud. This fraudulent misrepresentation affected Plaintiffs who were employees of PDVSA.

241.  The Plaintiffs suffered all sorts of damages and injuries by relying on the fraudulent misrepresentations of the Defendants.

242.  All according to the provisions of the Venezuelan Civil Code , Article 1281: Creditors may also request a declaration of simulation of the acts carried out by the debtor. This action lasts five years from the day on which the creditors learned of the simulated act.

243.  In this case, even as recent as of this month, Defendants have engaged in simulation and fraudulent misrepresentations to Plaintiffs and others in similar situation.

244.  As of this month of September it has been recorded that Citgo Petroleum has been valued by its parent company PDVSA at between $32 billion and $40 billion, according to a hearing in this court of law. It was disclosed during the hearing to update a U.S. judge on talks to enact a court-ordered

auction of shares in Citgo's parent to satisfy more than $23 billion in claims against Venezuela and its state oil company PDVSA.

245.   The refiner's value was based on Citgo's earnings of $4 billion before interest, taxes, depreciation and amortization, Ray Schrock, an attorney for a court official, told the court. He said Citgo's parent was seeking an indemnity bond of that value in a related dispute over the parent's share certificate.

246.   As recent as August, Defendant PDVSA Ad-hoc had stated through its President of the board, that CITGO Petroleum had a value of about 12 billion USD, and therefore it was not feasible to honor the debts with PDVSA workers. Such a difference of 28 billion USD, from 12 billion to 40 billion, in one week, can not be reasonably explained, other that by the pretension of concealing the value of an asset in order to defraud a rightful creditor such as workers.

247.   Accordingly, the Junta Administradora de PDVSA Ad hoc has fraudulently concealed from workers the estimated value of the assets from which some monetary relief could be obtained.

248.   The Junta Administradora de PDVSA Ad hoc is in the known that workers wages, indemnification from terrorism, indemnification for work related wrongs and similar wrongs, have a preferential creditor status, under

both laws of the United States and Venezuela. Only secured creditors would have any arguable standing similar to workers, and there is not a single secured creditor in the current process of Crystallex v. Bolivarian Republic of Venezuela. Therefore the evidences of fraudulent concealment are clear and speak for themselves.

### 249.  Conversion

250.  The Defendants deprived the interest of the plaintiffs in property through unauthorized acts and causing losses. The Defendant seized, occupied, took possession of, properties, goods, real estate, machinery, etc. it was not entitled to.  The default remedy is the damages, considering the fair market value of the property or returning the properties. ███████████████

████████████████████████████████████████████

███████████████████████████████. All in violation of Constitution of the Bolivarian Republic of Venezuela, stating,

    a.  *Article 115.- The right to property is guaranteed. Every person has the right to use, enjoy, and dispose of his or her property. The property will be subject to the contributions, restrictions and obligations established by law for purposes of public utility or general interest. Only for reasons of public utility or social interest, through a final*

judgment and timely payment of fair compensation, the expropriation of any type of property may be declared.

b. *Article 116.- Confiscations of property will not be decreed or executed except in the cases permitted by this Constitution. By way of exception, the assets of natural or legal persons, national or foreign, responsible for crimes committed against public assets, the assets of those who have been illicitly enriched under the protection of the Public Power, and the goods coming from commercial, financial or any other activities linked to the illicit trafficking of psychotropic substances and narcotics.*

251. **In the case of** 

252.

253. **Additionally, in the case of**

**, the question of exile for political reasons and its relationship with the de facto loss or**

expropriation of a citizen's property raises complex considerations in the field of legal philosophy. In this essay, we will explore the reasons supporting the idea that political exile intrinsically entails the loss of an individual's capacities to use, fruit, and abuse property.

254.    First of all, it is essential to understand the very concept of political exile and its implication in the legal sphere. Political exile refers to the forced expulsion of an individual from their country of origin due to political reasons, usually as a consequence of ideological conflicts with the ruling regime. This act, although often justified as a national security measure, raises fundamental questions about individual rights and private property.

255.    Property, understood as the exclusive right of use, fruit and abuse of a good, forms the basis of many philosophical and legal theories. From the Lockean perspective, for example, property arises from labor mixed with nature, and the loss of that property is a direct violation of natural law. In the context of political exile, this violation manifests itself in the deprivation of the individual's ability to use his property, since he is prevented from residing in his place of origin.

256.    Fruitfulness, another crucial component of property, is significantly affected in political exile. The inability to access the economic and social

benefits derived from property, such as renting real estate or participating in productive activities, constitutes a tangible loss for the exiled individual.  This economic deprivation not only impacts his material well-being, but also contributes to the exile's vulnerability and dependence on his new environment.

257.    The dimension of abuse, which implies the right to dispose of property freely and autonomously, is equally undermined in political exile.  Restrictions imposed by the host state or the absence of a legal framework familiar to the exiled individual limit his ability to make decisions about his property in accordance with his own interests and values.  This aspect raises ethical questions about the legitimacy of restricting a person's autonomy in relation to his possessions as a consequence of his political situation.

258.    From a broader perspective, the loss of the capacities of use, fruit and abuse in political exile can also be interpreted as a form of de facto expropriation.  Although the term "expropriation" is often associated with direct state action, political exile can be considered a de facto expropriation, as it deprives the individual of fundamental rights associated with property.

259.    The argument in favor of the loss of property in political exile is also supported by contemporary theories of human rights.  The Universal Declaration of Human Rights proclaims the right to property as an essential component of human dignity.  The deprivation of this right, as occurs in political exile, raises questions about the coherence of States with respect to their international human rights commitments.

260.    On the other hand, it could be objected that the loss of property in political exile is not intrinsic, but a contingent consequence of the decisions of the affected individual.  From a liberal perspective, one could argue that by choosing to resist or challenge the state, the individual consciously assumes the risk of losing certain rights, including property.  However, this perspective omits the complexities of political situations and the real limitations that the exiled individual faces when making decisions.

261.    In conclusion, the relationship between political exile and the de facto loss or expropriation of a citizen's property involves profound philosophical and ethical considerations.  The denial of the capacities to use, fruit and abuse as a consequence of political exile raises questions about justice, individual autonomy and human rights.  As the international community seeks to address the challenges associated with

**political exile, it is crucial to consider these issues from a perspective grounded in the philosophy of law and ethical principles that underpin our understanding of property and human dignity.**

**262. Negligence and Bad Faith**

263. The Defendants had legal duties with respect to the workers and their rights as established in Venezuelan Law, U.S. Law and International Treaties subscribed by Venezuela;

264. Defendants failed to honor its duties with workers and contractors, such as due care, fiduciary duties (embezzlement of workers pension fund), *paterfamilias* duties (destruction or neglect of contractors equipment in Defendant installations)

265. Plaintiffs suffered great damage by actions of Defendant;

266. The Failure to perform a number of duties  by Defendants result in this Cause of Action.

267. Intentional Torts: Plaintiffs suffered the  deliberate actions taken by PDVSA that caused harm to them and their property. In the case of  all and each Plaintiff the following torts can be asserted:

268. Assault where Defendant PDVSA intentionally created the apprehension of imminent harmful or offensive contact against the plaintiffs can be clearly established.

269.   Battery:  where Defendant PDVSA intentionally caused harmful or offensive contact with the plaintiffs.

270.   False Imprisonment: The defendant intentionally confined or restrained the plaintiff's freedom of movement. ███████████████

███████████████████████

271.   Intentional Infliction of Emotional Distress: The defendant engaged in extreme and outrageous conduct that caused severe emotional distress to all plaintiffs. All Plaintiffs have suffered financial duress due to the wrongdoings of Defendants.

272.   Trespass: The defendant intentionally entered onto the plaintiff's property without permission specifically in the cases of ███████████████

███████████████

273.   Defamation, falsity and harm. As President of Venezuela, Ministers, Members of Parliament and other Defendants made derogatory and false statements, both verbal and written, with malice leading to the loss or injury to the reputation of Plaintiffs, including labeling them and terrorists, leading imprisonment, exile and persecution, and such statements were not made under underprivileged circumstances. PDVSA and CITGO officers have accused Plaintiffs and others in a similar situation of being terrorists.

274.    Even as of present, the 

**275.    THIRD CAUSE OF ACTION - Precedent causes of action**

276.    Plaintiffs respectfully bring to the court the similarities of this case with the case of the Victims of the September 11th Terrorist attack v. Taliban in the attachment of Central Bank of Afghanistan. As this is an evolving issue, where the Department of State recognizes  "**Nicolas Maduro continues to claim to be the leader of Venezuela and retains control and the loyalty of the Venezuelan Armed Forces (FANB).  Members of the Maduro regime continue to engage in criminal activities and members of several Colombian FTOs — including the Revolutionary Armed Forces of Colombia-People's Army (FARC-EP), Segunda Marquetalia, and the National Liberation Army (ELN) — continue to operate in Venezuelan territory with relative impunity.**"(U.S.Department of State - Country Reports on Terrorism 2021: Venezuela) the cause of action stands based on the statements of the U.S. Department of State , the ongoing litigations

against states or de facto governments in control of a territory and similar

covered in the Terrorism Risk Insurance Act of 2002 (TRIA).

**277.   FOURTH CAUSE OF ACTION (Equity-related causes of action)**

**278.   For unjust enrichment**

279.   Defendants are responsible  for appropriation of money, assets and all

sort of property from the Plaintiffs.

280.   ████████████████████████████████████████████

████████████████████████████████████████████

████████████. All Plaintiffs have claims on money from wages and unpaid

contractual obligations.

281.   The Plaintiffs seek compensation for the injuries inflicted by the

Defendants.

282.   In the case of ███████████████████████████████

████████due wages, violation of union privileges were incurred by

PDVSA.

283.   **Violation of labor laws:** Plaintiffs allege that PDVSA violated the labor

laws of the Republica Bolivariana de Venezuela by failing to pay them their

full wages and benefits, failing to provide them with adequate health

insurance, and failing to provide them with safe working conditions.

Persecution and discrimination on political grounds is clear on the cases of all Plaintiffs.

284. **Violation of international treaties:** Plaintiffs allege that PDVSA violated international treaties, such as the International Labour Organization's (ILO) Convention 158 on Termination of Employment, by failing to pay them their full wages and benefits, failing to provide them with adequate health insurance, and failing to provide them with safe working conditions.

285. The Plaintiffs allege that PDVSA's actions violated Plaintiffs employment contracts, as well as the laws of Republica Bolivariana de Venezuela and international treaties. The Plaintiffs deserve damages for their lost wages, benefits, and other losses. They also deserve to have compensation as Defendants enjoined from continuing to violate the rights of the Plaintiffs. The Plaintiffs are likely to succeed in their case. They have a strong case, and the law is on their side.

286. Additionally the actions of Defendants agains█████████████████
█████████████████████████████████████████
███████████████████

287.   Violation of the Freedom of Speech Rights in the case of Lead Plaintiff relate to the closing, by means of financial threats ████████████████

████████████

## 288.   FRAUDULENT CONCEALMENT

289.   As stated above in Parr. 218 to Parr. 224, PDVSA and Junta Administradora Ad hoc de PDVSA have fraudulently concealed extremely relevant information to workers and contractors and taken deliberate steps to misrepresent facts in order to avoid honoring the rights of workers.

290.   Defendants deprived Plaintiffs of access to all documentation and evidence they were entitled.  Defendants systematically denied access to all type of electronic media to Plaintiffs. Defendants erased, deleted, blocked and performed other similar activities in order to delete or eliminate public sources of evidence including those in media.

291.   Even as of today, PDVSA and Junta Administradora Ad hoc de PDVSA allege that due to not having access to the workers and contractors files, no compensation can be agreed upon. **It is clear to law, equity and fairness that had the Defendants a willingness to voluntarily comply with the law and justice, some basic, initial, temporary and proper compensation could have been agreed upon.**

292.    Additionally, in the case of the PDVSA Pension Fund, the government
fraudulently concealed the injuries and offered the workers ███████████

████████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████

293.    While the abusive actions were performed, Venezuela repeatedly,
including through its former President Hugo Chávez, Ministers and Vice
Ministers Rafael Ramirez, Nervis Villalobos, Jose Alejandro Rojas,
maintained that it would refuse to pay any compensation to the workers,
firms or others. To that end, Venezuela devised a fraudulent scheme to
transfer $2.8 billion out of the United States. It did so through a complex
series of debt offerings and dividend transfers involving Petróleos De
Venezuela S.A. and its wholly-owned Delaware subsidiaries, Citgo Holding,
Inc. ("Citgo Holding") and defendant PDV Holding, Inc. ("PDV Holding").
Venezuela's purpose was clear: to move its assets out of the United States to
prevent judgment creditors such as workers or private firms from executing
upon them. See 879 F.3d 79 United States Court of Appeals, Third Circuit.
CRYSTALLEX INTERNATIONAL CORP.v.PETRÓLEOS DE
VENEZUELA, S.A.; PDV Holding, Inc.; and CITGO Holding, Inc., f/k/a

PDV America, Inc. PDV Holding Inc., Appellant Nos. 16-4012 & 17-1439

Argued September 12, 2017 (Opinion filed: January 3, 2018)

## **DAMAGES**

The Plaintiffs hereby adopt, restate, and relate each and every paragraph above as if fully set forth herein.  Defendants actions and omissions, as set forth above, proximately caused injuries to the Plaintiffs which resulted in the following damages for which the Plaintiffs are entitled to reasonable and proper compensation:

Recovery of damages for the lost, stolen and seized property.

Recovery of damages for the mental suffering of Plaintiffs.

Recovery of damages for the loss of retirement benefits that Plaintiffs would have earned but for the wrongful termination of contracts.

Recovery of damages for the loss of any benefits under plans governed by the Employee Retirement plans or funds, or otherwise.

Recovery of damages for defamation and injury to the reputation of Plaintiffs.

a) past and future medical expenses;

b) past and future physical pain and mental anguish;

c) past and future physical impairment;

e) past lost wages and future lost wage-earning capacity;

h) past and future pecuniary loss; and

i) attorneys' fees .

Plaintiffs seek to recover pre-judgment and post-judgment interest at the statutory rate or at such other rate as is set by this Court.

Plaintiffs seek all damages they are entitled to under the law, whether pled or not. This includes exemplary and punitive damages whereby exemplary damages caps do not apply according to Delaware Civil Code .

Plaintiffs ask for damages to be awarded to the under the common law and other statutes of the State of Delaware, such damages to be treble the amount of the actual damages proved.

## JURY TRIAL DEMAND

Pursuant to the provisions of FRCP Rule 38. Right to a Jury Trial and of Delaware Rules Civil Procedure Super. Ct. 38 and 39, Plaintiffs formally make this demand and application for a jury trial in this lawsuit. Plaintiffs hereby demand trial by jury for all causes of action, claims or issues in this action which are triable as a matter of right to a jury.

## PRAYER FOR RELIEF

For the foregoing reasons, the Plaintiffs  respectfully request that the Court:

That the Court determine that Plaintiffs have right to bring this  action for the claims alleged by the and that judgment be entered in favor of Plaintiffs and against Defendant;

That Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein; or from entering into any other conspiracy alleged herein, or from entering into ·any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

That the Court adjudge and decree that Defendant's contract, conspiracy, or combination constitutes an illegal restraint of worker rights.

That the Court adjudge and decree that Defendant's contract, conspiracy, or combination constitutes a violation of most basic human rights.

Enjoin Defendants from continuing to violate the Plaintiff's rights.

That Plaintiffs be awarded their damages, in an amount according to injury;

That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendant as a result of their acts of unjust enrichment, or any acts in violation of laws of fiduciary duties;

That Plaintiffs damages be declared as preferential in all collection proceedings, including attachments, bankruptcy and similar.

That Plaintiffs be awarded proper interest for damages after the date determined by the court;  that damages be trebbled as permitted by law.

That Plaintiffs recover their costs of suit and reasonable attorney's fees; and

That the Court grant other legal and equitable relief as it may deem just and proper under the circumstances, including such other relief as the Court may deem just and proper to redress, and prevent recurrence of, the alleged violation to dissipate the effects of Defendant's violations.

Order Defendants to pay damages to Plaintiffs in an amount to be determined during the process; and grant such other relief as the Court may deem just and equitable.

Respectfully submitted,





Plaintiffs,

## PROPOSED ORDER -

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE



FILED

MAR 8 2024

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Plaintiffs

V.

| Petróleos de Venezuela, S.A. (PDVSA); Defendant PDV Holding; Defendant PDV America; Defendant CITGO Holding; Defendant | COMPLAINT FOR VIOLATION OF LABOR RIGHTS, HUMAN RIGHTS, BREACH OF CONTRACT AND OTHER CAUSES. |
|---|---|

| CITGO Petroleum Corporation; Defendant  Junta Administradora Ad-Hoc de PDVSA; Defendant  Defendants, | Civil Action No: 1:23-CV-00989-MN |
|---|---|

## **PROPOSED ORDER**

### ORDER

Upon initial revision of complaint, taken into account the facts and circumstances presented by Plaintiffs, this Court rules,

1. The Plaintiffs have a right to bring this action;

2. The complaint is NOT DISMISSED and service of process shall be issued.

3. Court orders case to remain sealed including name of initial claimants who have acted as *pro se* filers and in the case of any additional filing by such Plaintiffs in the case, that their names remain sealed as filers as well.

4. Court orders that name of all and any additional claimant on the matter of human rights violation in the case be sealed *in chambers* (court only)

5. That Plaintiffs damages and awards might be declared as preferential in all collection proceedings, including attachments, bankruptcy and similar.

6. Interim Injunction, the Court adjudges and decrees that Defendant's contract, conspiracy, or combination constitutes an illegal restraint of worker rights.

7. Interim Injunction, Court enjoins Defendants from continuing to violate the Plaintiffs' rights so that Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein; or from entering into any other conspiracy alleged herein, or from entering into ·any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

8. Court grants *Plaintiffs* to seek discovery from the Defendants and counsel,

9. Court orders summons to be issued.

10. Court notifies the corresponding Judge in the District Court of Delaware, where the case Crystallex v. Venezuela (1:17-MC-00157) is currently under litigation, that this case has been entered by Plaintiffs, that a large number of additional Plaintiffs has been identified and have provided sworn testimony of their intention to join the action, and therefore will address the Hon. Judge

presiding on the case of Crystallex v. Venezuela about the prima facie considerations of the case initiated in this court as follows,

01. Credible Legal Arguments: The Plaintiffs have articulated legal arguments that, at first glance, appear to be well-founded in the applicable statutes, regulations, and case law. Plaintiffs have presented convincing interpretations of the law that deserve careful consideration.

02. Substantial Evidence: The Plaintiffs have presented a substantial body of evidence, including witness testimony and documentary exhibits, which suggests a strong prima facie case. The evidence appears to be consistent with their legal arguments and raises valid concerns that merit further examination.

03. Public Interest: The subject matter of this case is of significant public interest and has the potential to impact a broad segment of our society and The Americas. As such, a thorough and impartial review of the case is essential to ensure that the principles of justice are upheld.

04. Equity and Fairness: Preliminarily, it appears that the Plaintiffs may suffer substantial harm if their claims are not adequately addressed. It is incumbent upon our judicial system to ensure fairness and equity in all proceedings, and I believe this case highlights the need for such principles.

05. In light of the above, I respectfully request that your honorable court take into account the preliminary assessment of the case should the Plaintiffs obtain a favorable judgment.

11. Court orders a 180 days stay on all sales, liquidations, court ordered liquidations, assignments or similar disposition, of assets, shares, bonds, dividends by or of  Petróleos de Venezuela, S.A. (PDVSA); PDV Holding; PDV America; CITGO Holding; CITGO Petroleum Corporation; Junta Administradora Ad-Hoc de PDVSA; in order to settle the controversy pertaining to the Plaintiffs and other in a similar situation as preferred creditors.

12. Court orders   Petróleos de Venezuela, S.A. (PDVSA); PDV Holding; PDV America; CITGO Holding; CITGO Petroleum Corporation;  to refrain from

issuing any type of debt without the permission of this Court, in order to prevent any substantial change in its equity, unreasonable issuance of debt or any other event which might damage the Plaintiffs.

13. Court orders Defendants and Plaintiff to arrange for a mediation meeting under the rules of this court, no later than the 10th of February 2024**; all expenses involved in attendance and preparation of mediation in charge to Defendant Junta Administradora de PDVSA ad hoc**.

UNITED STATES DISTRICT JUDGE

**Attachment I**

**List, identification and standing of Plaintiffs.**







---

[3] Exhibit I: See 2004 information and photographs on the installation of the CLIPP at:
http://urru.org/_eventos/octubre_2004/20041017_1.htm
http://urru.org/fotos/0_2004/20041017_CLIPP1.htm



---

[4] See complete Hearing at https://www.youtube.com/watch?v=PG5eKkSIFLY
[5] Exhibit III: Cover of UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA Miami Division PDVSA U.S. LITIGATION TRUST, Plaintiff, v. LUKOIL PAN AMERICAS LLC;et Al., Defendants. Case No. 1:18-CV-20818 (DPG)
[6] Exhibit IV: On Jorge Alejandro Rodriguez as a Public known person see the Google search for "Jorge Alejandro Rodriguez" CITGO:
https://www.google.com/search?safe=active&sxsrf=ALeKk00Q9mWTVT2XUKyCKb9sjhWlhzb5dw%3A1592945161235&ei=CWryXt_yDZiT8gKfh4XIAw&q=%22jorge+alejandro+rodriguez%22+citgo+pdvsa&oq=%22jorge+alejandro+rodriguez%22+citgo+pdvsa&gs_lcp=CgZwc3ktYWIQAzoCCAA6BggAEBYQHjoFCCEQoAE6BAghEBU6BwghEAoQoAFQtwdYyShgli1oAHAAeACAAXylAaMKkgEDNy42mAEAoAEBgqEHZ3dzLXdpeg&sclient=psy-ab&ved=0ahUKEwifm-2T55jqAhWYiVwKHZ9DATkQ4dUDCAw&uact=5





















**Attachment II**

FILED
MAR 8 2024
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

MAB

**Statements and evidence on terrorist activities of the Venezuelan Government including persecution of union leaders, civic leaders, etc.**

294.   In February 2003, The Economist and Agence France Presse (AFP) reported that the Venezuelan President, Hugo Chávez, had refused to rehire the strikers who had been laid off (The Economist 8 Feb. 2003; AFP 9 Feb. 2003). Chávez was also reported to have had every intention of taking the strikers to court (ibid.). BBC Mundo noted that Chávez believed that a large number of the fired workers [translation] "should go to jail" (10 Feb. 2003). That same month, several PDVSA employees asked the National Assembly to block a motion to dismiss 9,000 more strikers who were accused of [translation] "acts of sabotage," according to BBC Mundo (10 Feb. 2003). Energy and mines minister Rafael Ramirez said "the government will not countenance an amnesty for strikers (though it will consider the reinstatement of people who were ill, or on leave, at the time of the strike)" (Latin American Weekly Report 11 Feb. 2003).

295.   On 27 February 2003, AFP reported that a court had ordered the arrest of six former PDVSA executives because they had organized the December 2002 strike. Among the six managers were Juan Fernández, Horacio Medina and Edgar Quijano (AFP 27 Feb. 2003). According to their lawyer, the arrest was made [translation] "on political rather than legal grounds" (ibid.). Latin

American Regional Reports noted that an arrest warrant was issued against seven former PDVSA managers, who "were accused of sabotage and damage to property" (4 Mar. 2003). Latin American Weekly Report indicated that a Caracas appeals court dismissed the arrest warrants on 18 March 2003 because of "violations of due process, the norms of competence, the rights of the accused, the right to defense and the absence of jurisdictional control" (25 Mar. 2003).

296.   On 13 March 2003, approximately 50 discharged employees held a demonstration in front of the Embassy of France in Caracas to express their dissatisfaction with French companies working with PDVSA (AFP 13 Mar. 2003).

297.   In May 2003, El Universal reported the creation of the Funds for Resistance (Fondo de Resistencia), an organization formed by some 18,000 fired PDVSA workers that apparently offers employment projects in the oil industry, as well as financial aid to families who have been the most seriously affected by the lay-offs, because some have had trouble paying for basic medial care (30 May 2003). The association was to offer its management expertise in the oil industry to about 45 companies (El Universal 30 May 2003). With this initiative, 3,424 former employees were to benefit from medical insurance with a private company at an affordable

price; furthermore, 21,000 kilograms of food was distributed to the most needy families (ibid.). El Universal indicated that the association is entirely funded by donations and the income earned by members of the Funds for Resistance (ibid.). Members number approximately 5,000 and must contribute 24,000 bolívares per month (ibid.), or about CAN$17 (Bank of Canada 21 May 2004).

298.   El Universal reported that five employees who were laid off by PDVSA have died as a result of their difficult financial situation; four committed suicide, and the fifth was killed by members of organized crime while working as a taxi driver to make ends meet (30 May 2003). Most of the employees dismissed were executives (Latin American Weekly Report 11 Feb. 2003).

299.   According to an EFE News Service article, former PDVSA employees and pro-government demonstrators clashed in July 2003 in the State of Zulia, in western Venezuela (EFE 11 July 2003). PDVSA asked the courts to forcibly evict strikers from the company's housing complex (AP 22 July 2003). A spokesperson for Petroleum People (Gente del Petróleo), Edgar Paredes, said that armed men "were trying to violently evict the former oil workers from company-owned housing" (EFE 11 July 2003). A pro-Chávez demonstrator said that "since the former workers had been fired from the

company, they should vacate the firm's housing units" (ibid.). According to Paredes and Froilan Barrios, a representative of the CTV, the largest union in Venezuela, "the national guard had 'illegally' arrested between 14 and 17 people" in the commotion (ibid.). The Associated Press (AP) reported that in several housing complexes, such as Tia Juana, Cardon and Amuay, fired employees were fighting not only "eviction from their homes at the hands of the National Guard and Chávez activists," but also the possibility that their children will be "yanked out of company schools" (22 July 2003). AP indicated that during a demonstration in Tia Juana, Chávez supporters "shouted epithets and waved rocks" at fired workers (AP 22 July 2003).

300.    The AP also mentioned that Unapetrol, a union founded by strikers, had petitioned the courts to reinstate fired workers who had not received any severance pay and had had their pensions and savings accounts frozen (ibid.). Furthermore, the publishing of strikers' names has made it very difficult for them to secure other employment (ibid.).

301.    On 20 July 2003, the Weekly News Update on the Americas reported the death of a striker who had been fired from PDVSA; he was shot dead by a National Guard soldier during a demonstration in the State of Anzoategui, in which protesters demanded the rehiring of some 18,000 fired PDVSA workers.

302.   In accordance with the Labour Act, PDVSA President, Alí Rodríguez Araque, announced on 11 August 2003 that fired workers would not lose any of their benefits (El Universal 11 Aug. 2003). However, Araque also said that former employees were to vacate housing properties belonging to PDVSA (ibid.). A few days later, on 14 August 2003, El Universal reported that benefits for the fired workers would be canceled.

303.   According to Weekly News Update on the Americas, "[s]ome 400 National Guard soldiers and 50 state police agents used tear gas and rubber bullets . . . as they evicted fired oil workers and their families from houses belonging to Venezuela's national oil monopoly, Petróleos de Venezuela SA (PDVSA)," in Punto Fijo, State of Falcon (28 Sept. 2003). The Venezuelan Program of Action and Education in Human Rights (Programa Venezolano de Educación y Acción en Derechos Humanos, PROVEA), a non-governmental organization (NGO), "called for an end to violent evictions" (Weekly News Update on the Americas 28 Sept. 2003). In November 2003, El Universal published an article on the PDVSA's decision to postpone evicting former employees until the following year (26 Nov. 2003). According to this newspaper, several fired workers believe that they have the right to continue living in PDVSA houses because litigation cases against the oil company are still pending (El Universal 26 Nov. 2003).

304.   On 15 May 2004, a representative of PROVEA provided the following information in correspondence sent to the Research Directorate:

305.   Some fired PDVSA workers, particularly those who made public statements or held senior public service positions, face [translation] "real difficulties" in finding employment in the public sector because of the [translation] "unofficial veto" against hiring them in the public service. The representative did note, however, that the situation is less difficult for other fired workers, but, according to him, the situation in Venezuela is such that anyone who signs a statement against a member of the political opposition will find it difficult to secure employment in the private sector, and anyone who signs a statement against the Venezuelan president will find it difficult to secure employment in the public service. Much depends on whether a person has signed the petition to impeach President Chávez.

306.   The PROVEA representative indicated that some private companies involved in the oil industry have been instructed not to hire fired PDVSA workers. However, he had heard of cases of employees being hired in the private sector, in the electrical power sector in Caracas, for example.

307.   The PROVEA representative concluded by stating that a handful of fired PDVSA workers were victims of acts of [translation] "repression or violent

evictions from houses belonging to PDVSA," and he noted that strikers were not targeted by ill-treatment, except in [translation] "very isolated" cases.

308.   Some additional statements from the Venezuelan Government and PDVSA include,

309.   Hugo Chávez, President of Venezuela (2002-2013)  "We will not allow a coup d'état, and if they try it, we will drown it in blood." - Speech on December 12, 2002, after a failed coup attempt against him.

310.   "I will not allow a group of fascists to take over PDVSA. If they try, I will personally fire them myself." - Speech on April 12, 2003, after a strike by PDVSA workers.

311.   "The opposition is a bunch of fascists who want to destroy Venezuela. They will not succeed." - Speech on October 27, 2012, after the opposition won control of the National Assembly.

312.   Rafael Ramírez, President of PDVSA (2004-2014)

313.   "We will not tolerate any sabotage of PDVSA by the opposition. If they try it, we will crush them." - Speech on January 27, 2004, after a series of fires at PDVSA facilities.

314.   "The opposition is a threat to the security of Venezuela. They must be stopped." - Speech on May 2, 2006, after the opposition held a protest against the government.

315.    "We will not allow the opposition to take over PDVSA. We will defend the company with our lives." - Speech on December 1, 2012, after the opposition won control of the National Assembly.

316.    Nicolás Maduro, President of Venezuela (2013-present)

317.    "The opposition is a terrorist group that wants to destroy Venezuela. They will not succeed." - Speech on February 12, 2014, after a wave of protests against the government.

318.    "The opposition is a bunch of coup plotters who want to overthrow the government. We will not allow it." - Speech on July 27, 2017, after the opposition held a referendum on Maduro's removal from office.

319.    "The opposition is a threat to the security of Venezuela. They must be stopped." - Speech on January 23, 2019, after the opposition leader Juan Guaidó declared himself interim president.

JOINT HEARING    before the    SUBCOMMITTEE ON NATIONAL SECURITY,HOMELAND DEFENSE AND FOREIGN OPERATIONS of the COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM and theSUBCOMMITTEE ON THE WESTERN HEMISPHERE and the SUBCOMMITTEE ON THE MIDDLE EAST AND SOUTH ASIA of the COMMITTEE ON FOREIGN AFFAIRSHOUSE OF REPRESENTATIVES JUNE 24, 2011

https://www.govinfo.gov/content/pkg/CHRG-112hhrg71297/html/CHRG-112hhrg71297.htm

Among other public sources,

A Decade Under Chavez: Political Intolerance and Lost Opportunities for Advancing Human Rights in Venezuela: https://www.hrw.org/reports/2008/venezuela0908/2.htm: This report by Human Rights Watch documents the political intolerance and human rights abuses that occurred in Venezuela under the presidency of Hugo Chávez. The report includes a section on the dismissal of thousands of PDVSA workers for their political beliefs.
Phone calls, dismissal threats:

Venezuela pressures state workers to vote:
https://www.reuters.com/article/us-venezuela-politics-workers-idUSKBN1AE08P: This article by Reuters reports on the allegations that the Venezuelan government was pressuring state workers to vote in favor of the Constituent Assembly in 2017. The article includes a quote from a PDVSA vice president who allegedly threatened to fire workers who did not vote.
Venezuela:

Current situation of employees of the state oil company Petróleos de Venezuela (PDVSA) who were discharged following their participation in strikes during December 2002 and April 2003; work reintegration; access to the public service and the private sector; whether private companies are instructed not to hire workers fired by PDVSA; remedies undertaken by: https://www.refworld.org/docid/41501c7215.html: This report by the UN Refugee Agency (UNHCR) provides information on the situation of PDVSA workers who were dismissed for their participation in strikes in 2002 and 2003.
The United Nations High Commissioner for Refugees informed with respect to the attacks against El Nacional:



New York, August 31, 2016 – Authorities should investigate incidents of vandalism of Venezuelan newspaper offices and do everything in their power to ensure that journalists can work without fear of reprisal, the Committee to Protect Journalists said today.



The damaged offices of El Nacional. Homemade explosives and excrement were thrown at the paper's Caracas offices this week. (El Nacional)

At around 2 a.m. yesterday, excrement and homemade explosives were thrown at the Caracas offices of the Venezuelan daily *El Nacional*. The attack comes less than a week after a separate incident in which unidentified assailants shot at the façade of *Diario de los Andes*, based in Valera, in the northwestern state of Trujillo.

In another incident in June, bags of animal excrement were thrown at the offices of *Correo del Caroní*, a daily newspaper in the eastern city of Puerto Ordaz. Security footage showed five men vandalizing the offices, according to local media reports.

Police are investigating the attack against *Diario de los Andes*, the paper's information director, Eylin Barrios, told CPJ. Miguel Otero, editor of *El Nacional*, also told CPJ that police were investigating the attacks against his paper. When CPJ called the Caracas police and the Public Ministry for comment, the calls went unanswered.

"The attacks against newspaper offices around the country is emblematic of the worsening environment for the press in Venezuela," said Carlos Lauría, CPJ's senior program coordinator for the Americas. "Venezuelan authorities must thoroughly investigate these attacks, bring all those responsible to justice, and ensure that journalists can do their work without fear of violence."

Citing witnesses, *El Nacional* reported that a group of men arrived at the offices in a white truck and threw homemade explosives and excrement at the premises. According to the report, the men shouted that the paper had betrayed Venezuela. In a similar attack in June *El Nacional's* offices were vandalized with spray paint and excrement, according to a report in the online news website *RunRun*.

In a separate incident, a security guard and another witness saw two men open fire on the offices of the daily *Diario de los Andes* on August 24, according to Barrios, the information director and a journalist at the newspaper. Barrios told CPJ that the newspaper's offices suffered significant damage, including broken windows and around 30 bullet holes. The newspaper was targeted on the day that it celebrated its 30th anniversary. Barrios told CPJ that she did not know the motive for the attack.

Both *El Nacional* and *Correo del Caroní* have faced harassment and legal persecution from authorities over their critical coverage, CPJ research shows.

Tensions are high in the country, which is in the midst of an economic crisis and political conflict over a proposed recall election to remove President Nicolás Maduro. Opposition leaders have scheduled a protest on September 1 to call on the National Electoral Council to schedule a recall referendum against the president.

The men who attacked *El Nacional* left a pamphlet titled "The march of 1S is the beginning of the end," referring to the September 1 march. According to *El Nacional*, the pamphlet was addressed to the editor of the newspaper. A translation of it read: "Miguel Henrique Otero: you openly expose your conspiratorial position against the people and the Bolivarian Revolution. Let it be clear to you that we are a free people, sovereign and patriotic. We will not allow unpatriotic people like you to govern again. Today we tell you that they will not return."

The pamphlet was signed "Chama Pueblo en Rebelión" (Chama-the people in rebellion), a pro-government group. The same phrase was spray painted on the front of *El Nacional*'s offices in the attack in June, the paper reported.

In a report published on *El Nacional*'s website yesterday, Otero said, "They have attacked the façade of *El Nacional* with excrement again. It seems like this is the only thing left in their brains and

it shows their lack of argument. They accuse us of all kinds of things, but they don't respond with ideas and disputes from their media. They simply appeal to insults, threats, and physical attacks."

CPJ research shows that under President Maduro, press freedom has deteriorated and independent journalists are restricted in their reporting. Journalists covering protests in Venezuela have faced violence and detentions in recent years.

Copyright notice: © Committee to Protect Journalists. All rights reserved. Articles

## Attachment III

















